# EVANS *v.* GORE, DEPUTY AND ACTING COLLECTOR OF INTERNAL REVENUE FOR THE WESTERN DISTRICT OF KENTUCKY.

## ERROR TO THE DISTRICT COURT OF THE UNITED STATES FOR THE WESTERN DISTRICT OF KENTUCKY.

No. 654. Argued March 5, 1920.—Decided June 1, 1920.

The relation of its members to the principle involved cannot relieve this court of the duty to determine the taxability of the salary of a judge of another federal court, in a case duly presenting the question. P. 247.

The primary purpose of the Constitution in providing (Art. I, § 1, cl. 6) that the compensation of the judges "shall not be diminished during their continuance in office," was not to benefit the judges, but to attract fit men to the bench and insure that independence of action and judgment which is essential to the maintenance of the Constitution and the impartial administration of justice. Pp. 248, 253.

Such being its purpose, the limitation is to be construed, not as a private grant, but as a limitation imposed in the public interest—not restrictively, but in accord with its spirit and the principle on which it proceeds. P. 253.

Any diminution which by necessary operation and effect withholds or takes from the judge a part of that which has been promised by law for his services, must be regarded as within the limitation. P. 254.

The prohibition embraces and prevents diminution by taxation, and has been so construed in the actual practice of the Government. P. 255.

The purpose of the Sixteenth Amendment, as shown by its language and history and by recent decisions of this court, was not to extend the taxing power to new or excepted subjects, but merely to remove all occasion otherwise existing for an apportionment among the States of taxes laid on income, whether derived from one source or another. P. 259.

A tax upon the net income of a United States District Judge, assessed under the Act of February 24, 1919, c. 18, 40 Stat. 1062, § 213, (passed since he took office) by including his official salary in the computation, operates to diminish his compensation, in violation

of the Constitution, and is invalid. P. 263. *Peck & Co.* v. *Lowe*, 247 U. S. 165; *United States Glue Co.* v. *Oak Creek*, *id*. 321, distinguished.

262 Fed. Rep. 550, reversed,

THE case is stated in the opinion.

*Mr. William Marshall Bullitt* and *Mr. Edmund F. Trabue*, with whom *Hon. Walter Evans, pro se, Mr. Frank P. Straus, Mr. Howard B. Lee* and *Mr. Helm Bruce* were on the briefs, for plaintiff in error.

*Mr. Assistant Attorney General Frierson*, with whom *The Attorney General* was on the brief, for defendant in error.

MR. JUSTICE VAN DEVANTER delivered the opinion of the court.

This is an action to recover money paid under protest as a tax alleged to be forbidden by the Constitution.

The plaintiff is the United States District Judge for the Western District of Kentucky, and holds that office under an appointment by the President made in 1899 with the advice and consent of the Senate. The tax which he calls in question was levied under the Act of February 24, 1919, c. 18, 40 Stat. 1062, on his net income for the year 1918, as computed under that act. His compensation or salary as District Judge was included in the computation. Had it been excluded he would not have been called on to pay any income tax for that year. The inclusion was in obedience to a provision in § 213 requiring the computation to embrace all gains, profits, income and the like, "including in the case of the President of the United States, the judges of the Supreme and inferior courts of the United States, [and others] . . . the compensation received as such." Whether he could be subjected to such a tax in

respect of his salary, consistently with the Constitution, is the matter in issue. If it be resolved against the tax he will be entitled to recover what he paid; otherwise his action must fail. It did fail in the District Court. 262 Fed. Rep. 550.

The Constitution establishes three great coördinate departments of the National Government,—the legislative, the executive, and the judicial,—and distributes. among them the powers confided to that Government by the people. Each department is dealt with in a separate Article, the legislative in the first, the executive in the second and the judicial in the third. Our present concern is chiefly with the third Article. It defines the judicial power, vests it in one supreme court and such inferior courts as Congress may from time to time ordain and establish, and declares: "The Judges, both of the supreme and inferior Courts, shall hold their Offices during good Behaviour, and shall, at stated Times, receive for their Services, a Compensation, which shall not be diminished during their Continuance in Office."

The plaintiff insists that the provision in § 213 which subjects him to a tax in respect of his compensation as a judge by its necessary operation and effect diminishes that compensation and therefore is repugnant to the constitutional limitation just quoted.

Stated in its broadest aspect, the contention involves the power to tax the compensation of federal judges in general,—and also the salary of the President, as to which the Constitution (Art. II, § 1, cl. 6) contains a similar limitation. Because of the individual relation of the members of this court to the question, thus broadly stated, we cannot but regret that its solution falls to us; and this although each member has been paying the tax in respect of his salary voluntarily and in regular course. But jurisdiction of the present case cannot be declined or renounced. The plaintiff was entitled by law to invoke our

decision on the question as respects his own compensa-
tion, in which no other judge can have any direct personal
interest; and there was no other appellate tribunal to
which under the law he could go.  He brought the case
here in due course, the Government joined him in asking
an early determination of the question involved, and both
have been heard at the bar and through printed briefs.  In
this situation, the only course open to us is to consider and
decide the cause,—a conclusion supported by precedents
reaching back many years.  Moreover, it appears that,
when this taxing provision was adopted, Congress re-
garded it as of uncertain constitutionality and both
contemplated and intended that the question should be
settled by us in a case like this.[1]

With what purpose does the Constitution provide that
the compensation of the judges "shall not be diminished
during their continuance in office"?  Is it primarily to
benefit the judges, or rather to promote the public weal by
giving them that independence which makes for an impar-
tial and courageous discharge of the judicial function?
Does the provision merely forbid direct diminution, such

---

[1] See House Report, No. 767, p. 29, 65th Cong., 2d sess.; Senate
Report, No. 617, p. 6, 65th Cong., 3rd sess.  And see Cong. Rec.,
vol. 56, p. 10370, where the Chairman of the House Committee, in
asking the adoption of the provision, said: "I wish to say, Mr. Chair-
man, that while there is considerable doubt as to the constitutionality
of taxing  .  .  .  Federal judges' or the President's salaries,  .  .  .
we can not settle it; we have not the power to settle it.  No power in
the world can settle it except the Supreme Court of the United States.
Let us raise it, as we have done, and let it be tested, and it can only
be done by some one protesting his tax and taking an appeal to the
Supreme Court."  And again: "I think really that every man who has
a doubt about this can very well vote for it and take the advice of the
gentleman from Pennsylvania [Mr. Graham], which was sound then
and is sound now, that this question ought to be raised by Congress,
the only power that can raise it, in order that it may be tested in the
Supreme Court, the only power that can decide it."

as expressly reducing the compensation from a greater to a less sum per year, and thereby leave the way open for indirect, yet effective, diminution, such as withholding or calling back a part as a tax on the whole? Or, does it mean that the judge shall have a sure and continuing right to the compensation, whereon he confidently may rely for his support during his continuance in office, so that he need have no apprehension lest his situation in this regard may be changed to his disadvantage?

The Constitution was framed on the fundamental theory that a larger measure of liberty and justice would be assured by vesting the three great powers,—the legislative, the executive, and the judicial,—in separate departments, each relatively independent of the others; and it was recognized that without this independence—if it was not made both real and enduring—the separation would fail of its purpose. All agreed that restraints and checks must be imposed to secure the requisite measure of independence; for otherwise the legislative department, inherently the strongest, might encroach on or even come to dominate the others, and the judicial, naturally the weakest, might be dwarfed or swayed by the other two, especially by the legislative.

The particular need for making the judiciary independent was elaborately pointed out by Alexander Hamilton in the Federalist, No. 78, from which we excerpt the following:

"The Executive not only dispenses the honors, but holds the sword of the community. The legislature not only commands the purse, but prescribes the rules by which the duties and rights of every citizen are to be regulated. The judiciary, on the contrary, has no influence over either the sword or the purse; no direction either of the strength or of the wealth of the society; and can take no active resolution whatever. It may truly be said to have neither force nor will, but merely judgment. . . . . This simple view of

the matter suggests several important consequences. It proves incontestably, that the judiciary is beyond comparison the weakest of the three departments of power; that it can never attack with success either of the other two; and that all possible care is requisite to enable it to defend itself against their attacks."

"The complete independence of the courts of justice is peculiarly essential in a limited Constitution. By a limited Constitution, I understand one which contains certain specified exceptions to the legislative authority; such, for instance, as that it shall pass no bills of attainder, no *ex post facto* laws, and the like. Limitations of this kind can be preserved in practice no other way than through the medium of courts of justice, whose duty it must be to declare all acts contrary to the manifest tenor of the Constitution void. Without this, all the reservations of particular rights or privileges would amount to nothing."

At a later period John Marshall, whose rich experience as lawyer, legislator, and Chief Justice enabled him to speak as no one else could, tersely said (Debates Va. Conv., 1829–1831, pp. 616, 619):

"Advert, Sir, to the duties of a Judge. He has to pass between the Government and the man whom that Government is prosecuting: between the most powerful individual in the community, and the poorest and most unpopular. It is of the last importance, that in the exercise of these duties, he should observe the utmost fairness. Need I press the necessity of this? Does not every man feel that his own personal security and the security of his property depends on that fairness? The Judicial Department comes home in its effects to every man's fireside: it passes on his property, his reputation, his life, his all. Is it not, to the last degree important, that he should be rendered perfectly and completely independent, with nothing to influence or control him but God and his conscience? . . . I have always thought, from my earliest youth till now, that the

greatest scourge an angry Heaven ever inflicted upon an ungrateful and a sinning people, was an ignorant, a corrupt, or a dependent Judiciary."

More recently the need for this independence was illustrated by Mr. Wilson, now the President, in the following admirable statement:

"It is also necessary that there should be a judiciary endowed with substantial and independent powers and secure against all corrupting or perverting influences; secure, also, against the arbitrary authority of the administrative heads of the government.

"Indeed there is a sense in which it may be said that the whole efficacy and reality of constitutional government resides in its courts. Our definition of liberty is that it is the best practicable adjustment between the powers of the government and the privileges of the individual."

"Our courts are the balance-wheel of our whole constitutional system; and ours is the only constitutional system so balanced and controlled. Other constitutional systems lack complete poise and certainty of operation because they lack the support and interpretation of authoritative, undisputable courts of law. It is clear beyond all need of exposition that for the definite maintenance of constitutional understandings it is indispensable, alike for the preservation of the liberty of the individual and for the preservation of the integrity of the powers of the government, that there should be some non-political forum in which those understandings can be impartially debated and determined. That forum our courts supply. There the individual may assert his rights; there the government must accept definition of its authority. There the individual may challenge the legality of governmental action and have it adjudged by the test of fundamental principles, and that test the government must abide; there the government can check the too aggressive self-assertion of the individual and establish its power upon lines which all

can comprehend and heed. The constitutional powers of the courts constitute the ultimate safeguard alike of individual privilege and of governmental prerogative. It is in this sense that our judiciary is the balance-wheel of our entire system; it is meant to maintain that nice adjustment between individual rights and governmental powers which constitutes political liberty." Constitutional Government in the United States, pp. 17, 142.

Conscious of the nature and scope of the power being vested in the national courts, recognizing that they would be charged with responsibilities more delicate and important than any ever before confided to judicial tribunals, and appreciating that they were to be, in the words of George Washington,[1] "the keystone of our political fabric," the Convention with unusual accord incorporated in the Constitution the provision that the judges "shall hold their offices during good behaviour, and shall, at stated times, receive for their services, a compensation, which shall not be diminished during their continuance in office." Can there be any doubt that the two things thus coupled in place—the clause in respect of tenure during good behavior and that in respect of an undiminishable compensation—were equally coupled in purpose? And is it not plain that their purpose was to invest the judges with an independence in keeping with the delicacy and importance of their task and with the imperative need for its impartial and fearless performance? Mr. Hamilton said in explanation and support of the provision (Federalist, No. 79): "Next to permanency in office, nothing can contribute more to the independence of the judges than a fixed provision for their support. . . . In the general course of human nature, *a power over a man's subsistence amounts to a power over his will.* . . . The enlightened friends of good government in every State, have seen cause to lament the want of precise and explicit precautions in

---

[1] Sparks' Washington, vol. X, pp. 35–36.

the State constitutions on this head. Some of these indeed have declared that *permanent* salaries should be established for the judges; but the experiment has in some instances shown that such expressions are not sufficiently definite to preclude legislative evasions. Something still more positive and unequivocal has been evinced to be requisite. . . . This provision for the support of the judges bears every mark of prudence and efficacy; and it may be safely affirmed that, together with the permanent tenure of their offices, it affords a better prospect of their independence than is discoverable in the constitutions of any of the States in regard to their own judges." The several commentators on the Constitution have adopted and reiterated this view,[1]—Judge Story adding: "Without this provision [as to an undiminishable compensation], the other, as to the tenure of office, would have been utterly nugatory, and indeed a mere mockery"; and Chancellor Kent observing: "It tends, also, to secure a succession of learned men on the bench, who, in consequence of a certain undiminished support, are enabled and induced to quit the lucrative pursuits of private business for the duties of that important station."

These considerations make it very plain, as we think, that the primary purpose of the prohibition against diminution was not to benefit the judges, but, like the clause in respect of tenure, to attract good and competent men to the bench and to promote that independence of action and judgment which is essential to the maintenance of the guaranties, limitations and pervading principles of the Constitution and to the administration of justice without respect to persons and with equal concern for the poor and the rich. Such being its purpose, it is to be construed, not as a private grant, but as a limitation imposed in the public interest; in other words, not restrictively, but in

[1] 2 Story, § 1628; 1 Kent's Com. *294; 1 Wilson's Works, 410, 411; 2 Tucker, § 364; Miller, 340–343; 1 Carson's Supreme Court, 6.

accord with its spirit and the principle on which it proceeds.

Obviously, diminution may be effected in more ways than one. Some may be direct and others indirect, or even evasive as Mr. Hamilton suggested. But all which by their necessary operation and effect withhold or take from the judge a part of that which has been promised by law for his services must be regarded as within the prohibition. Nothing short of this will give full effect to its spirit and principle. Here the plaintiff was paid the full compensation, but was subjected to an involuntary obligation to pay back a part, and the obligation was promptly enforced. Of what avail to him was the part which was paid with one hand and then taken back with the other? Was he not placed in practically the same situation as if it had been withheld in the first instance? Only by subordinating substance to mere form could it be held that his compensation was not diminished. Of course, the conclusion that it was diminished is the natural one. This is illustrated in *Dobbins* v. *Commissioners of Erie County*, 16 Pet. 435, 450, which involved a tax charged under a law of Pennsylvania against a revenue officer of the United States who was a citizen and resident of that State. The tax was adjusted or proportioned to his compensation, and the state court sustained it. 7 Watts, 513. In reversing that decision, this court, after showing that the compensation had been fixed by a law of Congress, said: "Does not a tax, then, by a state upon the office, diminishing the recompense, conflict with the law of the United States, which secures it to the officer in its entireness? It certainly has such an effect; and any law of a state imposing such a tax cannot be constitutional."

But it is urged that what the plaintiff was made to pay back was an income tax, and that a like tax was exacted of others engaged in private employment.

If the tax in respect of his compensation be prohibited,

it can find no justification in the taxation of other income as to which there is no prohibition; for, of course, doing what the Constitution permits gives no license to do what it prohibits.

The prohibition is general, contains no excepting words and appears to be directed against all diminution, whether for one purpose or another; and the reasons for its adoption, as publicly assigned at the time and commonly accepted ever since, make with impelling force for the conclusion that the fathers of the Constitution intended to prohibit diminution by taxation as well as otherwise,— that they regarded the independence of the judges as of far greater importance than any revenue that could come from taxing their salaries.

True, the taxing power is comprehensive and acknowledges few exceptions. But that there are exceptions, besides the one we here recognize and sustain, is well settled. In *Collector* v. *Day*, 11 Wall. 113, it was held that Congress could not impose an income tax in respect of the salary of a judge of a state court; in *Pollock* v. *Farmers' Loan & Trust Co.*, 157 U. S. 429, 585, 601, 652, 653, it was held—the full court agreeing on this point— that Congress was without power to impose such a tax in respect of interest received from bonds issued by a State or any of its counties or municipalities; and in *United States* v. *Railroad Co.*, 17 Wall. 322, there was a like holding as to municipal revenues derived by the city of Baltimore from its ownership of stock in a railroad company. None of those decisions was put on any express prohibition in the Constitution, for there is none; but all recognized and gave effect to a prohibition implied from the independence of the States within their own spheres.

When we consider, as was done in those cases, what is comprehended in the congressional power to tax,—where its exertion is not directly or impliedly interdicted,—it becomes additionally manifest that the prohibition now

under discussion was intended to embrace and prevent diminution through the exertion of that power; for, as this court repeatedly has held, the power to tax carries with it "the power to embarrass and destroy"; may be applied to every object within its range "in such measure as Congress may determine"; enables that body "to select one calling and omit another, to tax one class of property and to forbear to tax another"; and may be applied in different ways to different objects so long as there is "geographical uniformity" in the duties, imposts and excises imposed. *McCulloch* v. *Maryland*, 4 Wheat. 316, 431; *Pacific Insurance Co.* v. *Soule*, 7 Wall. 433, 443; *Austin* v. *The Aldermen*, 7 Wall. 694, 699; *Veazie Bank* v. *Fenno*, 8 Wall. 533, 541, 548; *Knowlton* v. *Moore*, 178 U. S. 41, 92, 106; *Treat* v. *White*, 181 U. S. 264, 268–269; *McCray* v. *United States*, 195 U. S. 27, 61; *Flint* v. *Stone Tracy Co.*, 220 U. S. 107, 158; *Billings* v. *United States*, 232 U. S. 261, 282; *Brushaber* v. *Union Pacific R. R. Co.*, 240 U. S. 1, 24–26. Is it not therefore morally certain that the discerning statesmen who framed the Constitution and were so sedulously bent on securing the independence of the judiciary intended to protect the compensation of the judges from assault and diminution in the name or form of a tax? Could not the purpose of the prohibition be wholly thwarted if this avenue of attack were left open? Certainly there is nothing in the words of the prohibition indicating that it is directed against one legislative power and not another; and in our opinion due regard for its spirit and principle requires that it be taken as directed against them all.

This view finds support in rulings in Pennsylvania, Louisiana and North Carolina made under like constitutional restrictions, *Commonwealth ex rel. Hepburn* v. *Mann*, 5 Watts & Serg. 403, 415, *et seq.*;[1] *New Orleans* v. *Lea*, 14

---

[1] The tax condemned was levied under a provision, in a general revenue law, charging a tax of two per cent. "upon all salaries and

La. Ann. 197; 48 N. Car. Appendix; N. .Car. Public
Documents 1899, Doc. No. 8, p. 95; 131 N. Car. 692;
*Purnell* v. *Page*, 133 N. Car. 125, and has strong sanction
in the actual practice of the Government, to which we now·
advert.

No attempt was made to tax the compensation of federal
judges prior to 1862. A statute of that year, c. 119, § 86,
12 Stat. 472, with its amendments, subjected the salaries
of all civil officers of the United States to an income tax of
three per cent. and was construed by the revenue officers
as including the compensation of the President and the
judges. Chief Justice Taney, the head of the judiciary,
wrote to the Secretary of the Treasury a letter of protest
(157 U. S. 701), based on the prohibition we are consider-
ing, and in the course of the letter said:

"The act in question, as you interpret it, diminishes the
ompensation of every judge three per cent, and if it can
oe diminished to that extent by the name of a tax, it may
in the same way be reduced from time to time at the
pleasure of the legislature.

"The Judiciary is one of the three great departments of
the government, created and established by the Constitu-
tion. Its duties and powers are specifically set forth, and
are of a character that requires it to be perfectly inde-
pendent of the two other departments, and in order to
place it beyond the reach and above even the suspicion of
any such influence, the power to reduce their compensa-
tion is expressly withheld from Congress, and excepted
from their powers of legislation.

"Language could not be more plain than that used in

emoluments of office, created or held by or under the constitution or
laws of this Commonwealth, and by or under any incorporation, in-
stitution, or company incorporated, by the said Commonwealth,
where such salaries or emoluments exceed two hundred dollars." Act
No. 232, § 2, Penn. Laws 1840, p. 613; Act No. 117, § 9, Penn. Laws
1841. p. 310.

the Constitution. It is moreover one of its most important and essential provisions. For the articles which limit the powers of the legislative and executive branches of the government, and those which provide safeguards for the protection of the citizen in his person and property, would be of little value without a judiciary to uphold and maintain them, which was free from every influence, direct or indirect, that might by possibility in times of political excitement warp their judgments.

"Upon these grounds I regard an act of Congress retaining in the Treasury a portion of the compensation of the judges, as unconstitutional and void."

The collection of the tax proceeded, and, at the suggestion of the Chief Justice, this court ordered his protest spread on its records. In 1869 the Secretary of the Treasury referred the question to the Attorney General (Judge Hoar) and that officer rendered an opinion in substantial accord with Chief Justice Taney's protest, and also advised that the tax on the President's compensation was likewise invalid. 13 Ops. Atty. Gen. 161. The tax on the compensation of the President and the judges was then discontinued, and the amounts theretofore collected were all refunded,—a part through administrative channels and a part through the action of the Court of Claims and ensuing appropriations by Congress. *Wayne* v. *United States*, 26 Ct. Clms. 274; c. 311, 27 Stat. 306. Thus the Secretary of the Treasury, the accounting officers, the Court of Claims and Congress accepted and gave effect to the view expressed by the Attorney General. In the Income Tax Act of 1894, c. 349, § 27, *et seq.*, 28 Stat. 509, nothing was said about the compensation of the judges; but Mr. Justice Field regarded it as included and gave that as one reason for joining in the decision holding the act unconstitutional. 157 U. S. 604–606. On the rehearing the Attorney General (Mr. Olney) frankly said in his brief: "There has never been a doubt since the opinion of Attorney General Hoar

that the salaries of the President and judges were exempt."
The Income Tax Acts of 1913, 1916 and 1917 (c. 16, 38
Stat. 168; c. 463, 39 Stat. 758; c. 63, 40 Stat. 329) severally
excepted the compensation of the judges then in office,—
also that of the President for the then current term.   In
short, during a period of more than one hundred and
twenty years there was but a single real attempt to tax the
judges in respect of their compensation, and that attempt
soon was disapproved and pronounced untenable by the
concurring action of judicial, executive and legislative
officers.   And so it is apparent that in the actual practice
of the Government the prohibition has been construed as
embracing and preventing diminution by taxation.

Does the Sixteenth Amendment authorize and support
this tax and the attendant diminution; that is to say,
does it bring within the taxing power subjects thereto-
fore excepted?   The court below answered in the negative;
and counsel for the Government say, "It is not, in view
of recent decisions, contended that this Amendment
rendered taxable as income anything which was not so
taxable before."   We might rest the matter here, but it
seems better that our view and the reasons therefor be
stated in this opinion, even if there be some repetition
of what recently has been said in other cases.

Preliminarily we observe that, unless there be some
real conflict between the Sixteenth Amendment and the
prohibition, in Article III, § 1, making the compensation
of the judges undiminishable, effect must be given to the
latter as well as to the former; and also that a purpose to
depart from or imperil a constitutional principle so widely
esteemed and so vital to our system of government as
the independence of the judiciary is not lightly to be
assumed.

In *Knowlton* v. *Moore, supra,* p. 95, this court said:
"The necessities which gave birth to the Constitution,
the controversies which preceded its formation, and the

conflicts of opinion which were settled by its adoption, may properly be taken into view for the purpose of tracing to its source any particular provision of the Constitution, in order thereby to be enabled to correctly interpret its meaning." This sound rule is as applicable to the Amendments as to the provisions of the original Constitution.

Let us turn then to the circumstances in which this Amendment was proposed and ratified and to the controversy it was intended to settle. By the Constitution all direct taxes were required to be apportioned among the several States according to their population, as ascertained by a census or enumeration (Art. I, § 2, cl. 3, and § 9, cl. 4), but no such requirement was imposed as to other taxes. And apart from capitation taxes, with which we now are not concerned, no rule was given for determining what taxes were direct and therefore to be apportioned, or what were indirect and not within that requirement. Controversy ensued and ultimately centered around the right classification of income from taxable real estate and from investments in taxable personal property. The matter then came before this court in *Pollock v. Farmers' Loan & Trust Co.*, 157 U. S. 429; 158 U. S. 601; and the decision when announced disclosed that the same differences in opinion existing elsewhere were shared by the members of the court,—five, the controlling number, regarding a tax on such income as in effect a direct tax on the property from which it arose and therefore as requiring apportionment, and four regarding it as indirect and not to be apportioned. Much of the law then under consideration had been framed according to the latter view and because of this and the adjudged inseparability of other portions the entire law was held invalid. Afterwards, to enable Congress to reach all taxable income more conveniently and effectively than would be possible as to much of it if an apportionment among the States were essential, the Sixteenth

Amendment was proposed and ratified. In other words, the purpose of the Amendment was to eliminate all occasion for such an apportionment because of the source from which the income came,—a change in no wise affecting the power to tax but only the mode of exercising it. The message of the President [1] recommending the adoption by Congress of a joint resolution proposing the Amendment, the debates [2] on the resolution by which it was proposed, and the public appeals [3]—corresponding to those in the Federalist—made to secure its ratification leave no doubt on this point. And that the proponents of the Amendment in drafting it lucidly and aptly expressed this as its object is shown by its words:

"The Congress shall have power to lay and collect taxes on incomes, from whatever source derived, without apportionment among the several States, and without regard to any census or enumeration."

True, Governor Hughes, of New York, in a message laying the Amendment before the legislature of that State for ratification or rejection, expressed some apprehension lest it might be construed as extending the taxing power to income not taxable before; but his message promptly brought forth from statesmen who participated in proposing the Amendment such convincing expositions of its purpose,[4] as here stated, that the apprehension was effectively dispelled and ratification followed.

Thus the genesis and words of the Amendment unite in showing that it does not extend the taxing power to new or excepted subjects, but merely removes all occasion otherwise existing for an apportionment among the States of taxes laid on income, whether derived from one

---

[1] Cong. Rec., vol. 44, p. 3344.

[2] Cong. Rec., vol. 44, pp. 1568–1570, 3377, 3900, 4067, 4105–4107, 4108–4121, 4389–4441.

[3] Cong. Rec., vol. 45, pp. 1694–1699, 2245–2247, 2539–2540.

[4] Cong. Rec., vol. 45, pp. 1694–1699, 2245–2247, 2539–2540.

source or another.[1] And we have so held in other cases.

In *Brushaber* v. *Union Pacific R. R. Co.*, 240 U. S. 1, where the purpose and effect of the Amendment were first drawn in question, the Chief Justice reviewed at length the legislative and judicial action which prompted its adoption and then, referring to its text and speaking for a unanimous court, said, pp. 17–18:

"It is clear on the face of this text that it does not purport to confer power to levy income taxes in a generic sense—an authority already possessed and never questioned—or to limit and distinguish between one kind of income taxes and another, but that the whole purpose of the Amendment was to relieve all income taxes when imposed from apportionment from a consideration of the source whence the income was derived. Indeed in the light of the history which we have given and of the decision in the *Pollock Case* and the ground upon which the ruling in that case was based, there is no escape from the conclusion that the Amendment was drawn for the purpose of doing away for the future with the principle upon which the *Pollock Case* was decided, that is, of determining whether a tax on income was direct not by a consideration of the burden placed on the taxed income upon which it directly operated, but by taking into view the burden which resulted on the property from which the income was derived, since in express terms the Amendment provides that income taxes, from whatever source

---

[1] In passing the income tax law of 1919 Congress refused to treat interest received from bonds issued by a State or any of its counties or municipalities as within the taxing power, Cong. Rec., vol. 57, pp. 553, 774–777, 2988; c. 18, § 213, 40 Stat. 1065; and in the regulations issued under that law the administrative officers recognize that the salaries and emoluments of the officers of a State and its political subdivisions are not taxable by the United States. Reg. 45, published 1920, pp. 47, 313; 31 Ops. Atty. Gen. 441.

the income may be derived, shall not be subject to the regulation of apportionment."

What was there said was reaffirmed and applied in *Stanton* v. *Baltic Mining Co.*, 240 U. S. 103, 112–113, and *Peck & Co.* v. *Lowe*, 247 U. S. 165, 172; and in *Eisner* v. *Macomber*, 252 U. S. 189, decided at the present term, we again held, citing the prior cases, that the Amendment "did not extend the taxing power to new subjects, but merely removed the necessity which otherwise might exist for an apportionment among the States of taxes laid on income."

After further consideration, we adhere to that view and accordingly hold that the Sixteenth Amendment does not authorize or support the tax in question.

Apart from his salary, a federal judge is as much within the taxing power as other men are. If he has a home or other property, it may be taxed just as if it belonged to another. If he has an income other than his salary, it also may be taxed in the same way. And, speaking generally, his duties and obligations as a citizen are not different from those of his neighbors. But for the common good—to render him, in the words of John Marshall, "perfectly and completely independent, with nothing to influence or control him but God and his conscience"— his compensation is protected from diminution in any form, whether by a tax or otherwise, and is assured to him in its entirety for his support.

The court below concluded that the compensation was not diminished, and regarded this as inferable from our decisions in *Peck & Co.* v. *Lowe*, 247 U. S. 165, 174–175, and *United States Glue Co.* v. *Oak Creek, ibid.* 321, 329. We think neither case tends to support that view. Each related to a business—one to exportation, the other to interstate commerce—which the taxing power—of Congress in one case, of a State in the other—was restrained from directly burdening; and the holding in both was

that an income tax laid, not on the gross receipts, but on the net proceeds remaining after all expenses were paid and losses adjusted, did not directly burden the business, but only indirectly and remotely affected it. Here the Constitution expressly forbids diminution of the judge's compensation, meaning, as we have shown, diminution by taxation as well as otherwise. The taxing act directs that the compensation—the full sum, with no deduction for expenses—be included in computing the net income, on which the tax is laid. If the compensation be the only income, the tax falls on it alone; and, if there be other income, the inclusion of the compensation augments the tax accordingly. In either event the compensation suffers a diminution to the extent that it is taxed.

We conclude that the tax was imposed contrary to the constitutional prohibition and so must be adjudged invalid.

*Judgment reversed.*

Mr. Justice Holmes, dissenting.

This is an action brought by the plaintiff in error against an acting Collector of Internal Revenue to recover a portion of the income tax paid by the former. The ground of the suit is that the plaintiff is entitled to deduct from the total of his net income six thousand dollars, being the amount of his salary as a judge of the District Court of the United States. The Act of February 24, 1919, c. 18, § 210, 40 Stat. 1057, 1062, taxes the net income of every individual, and § 213, p. 1065, requires the compensation received by the judges of the United States to be included in the gross income from which the net income is to be computed. This was done by the plaintiff in error and the tax was paid under protest. He contends that the requirement mentioned and the tax, to the extent that it was enhanced by consideration of the plaintiff's salary, are

contrary to Article III, § 1, of the Constitution, which provides that the compensation of the judges shall not be diminished during their continuance in office. Upon demurrer judgment was entered for the defendant, and the case comes here upon the single question of the validity of the above mentioned provisions of the act.

The decision below seems to me to have been right for two distinct reasons: that this tax would have been valid under the original Constitution, and that if not so, it was made lawful by the Sixteenth Amendment. In the first place, I think that the clause protecting the compensation of judges has no reference to a case like this. The exemption of salaries from diminution is intended to secure the independence of the judges, on the ground, as it was put by Hamilton in the Federalist, (No. 79,) that "a power over a man's subsistence amounts to a power over his will." That is a very good reason for preventing attempts to deal with a judge's salary as such, but seems to me no reason for exonerating him from the ordinary duties of a citizen, which he shares with all others. To require a man to pay the taxes that all other men have to pay cannot possibly be made an instrument to attack his independence as a judge. I see nothing in the purpose of this clause of the Constitution to indicate that the judges were to be a privileged class, free from bearing their share of the cost of the institutions upon which their well-being if not their life depends.

I see equally little in the letter of the clause to indicate the intent supposed. The tax on net incomes is a tax on the balance of a mutual account in which there always are some and may be many items on both sides. It seems to me that it cannot be affected by an inquiry into the source from which the items more or less remotely are derived. Obviously there is some point at which the immunity of a judge's salary stops, or to put it in the language of the clause, a point at which it could not be said that his com-

pensation was diminished by a charge. If he bought a house the fact that a part or the whole of the price had been paid from his compensation as judge would not exempt the house. So if he bought bonds. Yet in such cases the advantages of his salary would be diminished. Even if the house or bonds were bought with other money the same would be true, since the money would not have been free for such an application if he had not used his salary to satisfy other more peremptory needs. At some point, I repeat, money received as salary loses its specific character as such. Money held in trust loses its identity by being mingled with the general funds of the owner. I see no reason why the same should not be true of a salary. But I do not think that the result could be avoided by keeping the salary distinct. I think that the moment the salary is received, whether kept distinct or not, it becomes part of the general income of the owner, and is mingled with the rest, in theory of law, as an item in the mutual account with the United States. I see no greater reason for exempting the recipients while they still have the income as income than when they have invested it in a house or bond.

The decisions heretofore reached by this Court seem to me to justify my conclusion. In *Peck & Co. v. Lowe*, 247 U. S. 165, a tax was levied by Congress upon the income of the plaintiff corporation. More than two-thirds of the income were derived from exports and the Constitution in terms prohibits any tax on articles exported from any State. By construction it had been held to create "a freedom from any tax which directly burdens the exportation," *Fairbank* v. *United States*, 181 U. S. 283, 293. The prohibition was unequivocal and express, not merely an inference as in the present case. Yet it was held unanimously that the tax was valid. "It is not laid on income from exportation . . . in a discriminative way, but just as it is laid on other income. . . . There is no

discrimination. At most, exportation is affected only indirectly and remotely. The tax is levied . . . after the recipient of the income is free to use it as he chooses. Thus what is taxed—the net income—is as far removed from exportation as are articles intended for export before the exportation begins." 247 U. S. 174, 175. All this applies with even greater force when, as I have observed, the Constitution has no words that forbid a tax. In *United States Glue Co.* v. *Oak Creek*, 247 U. S. 321, 329, the same principle was affirmed as to interstate commerce and it was said that if there was no discrimination against such commerce the tax constituted one of the ordinary burdens of government from which parties were not exempted because they happened to be engaged in commerce among the States.

A second and independent reason why this tax appears to me valid is that, even if I am wrong as to the scope of the original document, the Sixteenth Amendment justifies the tax, whatever would have been the law before it was applied. By that Amendment Congress is given power to "collect taxes on incomes, from whatever source derived." It is true that it goes on "without apportionment among the several States, and without regard to any census or enumeration," and this shows the particular difficulty that led to it. But the only cause of that difficulty was an attempt to trace income to its source, and it seems to me that the Amendment was intended to put an end to the cause and not merely to obviate a single result. I do not see how judges can claim an abatement of their income tax on the ground that an item in their gross income is salary, when the power is given expressly to tax incomes from whatever source derived.

MR. JUSTICE BRANDEIS concurs in this opinion.