### COOK v. TAIT, Collector of Internal Revenue.

(District Court, D. Maryland. January 22, 1923.)

#### No. 1293.

Constitutional law ⚖️286—Internal revenue ⚖️7—Taxation of nonresident citizen on foreign income not taking property without due process.

Under Revenue Act 1921, § 213, a citizen of the United States is subject to income tax though residing in a foreign country and though his income is derived solely from tangible property permanently located in that country, and the imposition of such tax is within the power of Congress and is not unconstitutional as a taking of property without due process of law.

At Law. Action by George M. Cook against Galen L. Tait, Collector of Internal Revenue for the District of Maryland. On demurrer to declaration. Demurrer sustained.

Chas. Claflin Allen and Chas. Claflin Allen, Jr., both of St. Louis, Mo., for plaintiff.

Amos W. W. Woodcock, U. S. Atty., of Baltimore, Md., for defendant.

ROSE, Circuit Judge. The plaintiff is a citizen of the United States, who, since 1890, has continuously resided in the Republic of Mexico. His entire income comes from real and personal property, having a permanent situs in that country. The defendant called upon him to make a return of his income for taxation. With this demand he complied under protest. A tax was assessed upon him, and at the time suit was instituted he had paid the first installment of it, amounting to $298.34,

⚖️For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

to recover which this action is brought; he alleging that the payment was made under duress.

The defendant has demurred to the declaration, and asserts that the single issue presented is whether a tax imposed by Congress on the net income of a nonresident citizen of the United States, when that income is entirely derived from sources within a foreign country, is repugnant to the Constitution of the United States. In other lands, the attempt to impose such a tax has rarely been made. In a report of the British Royal Commission on Income Tax, which forms part of a memorandum on double taxation, dated January 28, 1921, of the Finance Section of the Provisional Economical and Financial Committee of the League of Nations (Official Publications of the League E. F. S. 16-A 16, section 3, annex 2, page 10), there is to be found the statement:

"Double income tax arises when two countries charge income tax on the same source of income. As it is not ordinarily practicable for a state to tax income effectively unless either the source of the income or the owner of the income is within its borders, it may be said broadly that the possibility of effective taxation exists only when the source of the income, or the residence of the owner is within the state. Although the United States of America charge also the income of a citizen even if he resides abroad, this may be regarded as an exceptional method of taxation, and the results in revenue depend, presumably, in a great measure, on sentiment and patriotism."

An examination of the accessible laws of all leading countries confirms the accuracy of the above-quoted statement, and seems to indicate that this country is probably the only one which attempts to tax a nonresident citizen upon income he derives from property permanently located in foreign lands. The Supreme Court has said:

"It may not be doubted, * * * speaking in a general sense, that the taxing power, when exerted, is not usually applied to those, even albeit they are citizens, who have a permanent domicile or residence outside the country levying the tax. Indeed we think it must be conceded that the levy of such a tax is so beyond the normal and usual exercise of the taxing power, as to cause it to be, when exerted, of rare occurrence and in the fullest extent exceptional. This being true, we must approach the statute with the purpose of ascertaining whether its provisions sanction such rare and exceptional taxation." United States v. Goelet, 232 U. S. 293, 34 Sup. Ct. 431, 58 L. Ed. 610.

Shortly after the beginning of the Civil War, the demand for revenue compelled the government to resort to an income tax. Section 49 of the Act of 1861 (12 Stat. 309) limited the imposition to incomes of persons residing in the United States, or derived, by a resident abroad, from property within this country. Section 116 of the Act of 1864 (13 Stat. 281) assumed to tax the income of every person residing in the United States, and of every citizen of the United States, residing abroad, whether that income was derived from sources within or without the United States, and the same purpose has been clearly manifested by every subsequent enactment levying a tax upon incomes, although section 262 of the law now in force (42 Stat. 232) provides that under certain circumstances not existing in the case of the plaintiff, gross income includes only that derived from sources within the United States.

Article 3 of Regulation 62, promulgated by the Commissioner of Internal Revenue, and approved by the Secretary of the Treasury under the Revenue Act of 1921, provides:

"Citizens of the United States, except those entitled to the benefits of section 262, * * * wherever resident, are liable to the tax. It makes no difference that they may own no assets within the United States, and may receive no income from sources within the United States. Every resident alien individual is liable to the tax, even though his income is wholly from sources outside the United States. Every nonresident alien individual is liable to the tax on his income from sources within the United States."

And article 4 of the same regulation declares:

"An individual born in the United States, subject to its jurisdiction, of either citizen or alien parents, who has long since moved to a foreign country and established a domicile there, but who has neither been naturalized in or taken an oath of allegiance to that or any foreign country, is still a citizen of the United States."

There is really no room for question that Congress has sought to tax the plaintiff's income, and has used words apt to accomplish that purpose. Even so, he says it has done a vain thing, for it has no constitutional power to submit him to that burden. With much force and learning he argues that the Sixteenth Amendment did not make taxable anything which could never before have been taxed. Its purpose and effect was merely to exempt a tax upon incomes, no matter whence they came, from the requirement of apportionment among the states. Evans v. Gore, 253 U. S. 260, 40 Sup. Ct. 550, 64 L. Ed. 887, 11 A. L. R. 519. He asserts that the income here sought to be taxed, arising as it does from real and tangible personal property, having a permanent location, is a direct tax. Pollock v. Farmers Loan & Trust Co., 157 U. S. 429, 15 Sup. Ct. 673, 39 L. Ed. 759. He then argues that no one has ever contended that Congress could levy a direct tax upon property in a foreign land, and it must be conceded that the idea of doing so does not seem ever to have suggested itself to any one. He relies upon Loughborough v. Blake, 5 Wheat. 317 (18 U. S.) 5 L. Ed. 98, where it was said that the power to impose a direct tax "extends to all places over which the government extends." The assumption throughout the whole discussion in that case was that the power to tax was coextensive with our territorial boundaries. In his opinion Marshall held that it reached to them, and quite obviously he assumed that it did not go farther.

The plaintiff contends that one state of our Union may not levy a tax upon real or tangible property, having a permanent location in another, even when the owner is one of its resident citizens. A Kentucky corporation owned many freight cars, which it hired out. Most of them were habitually used in other states. Nevertheless Kentucky attempted to tax them all. When the case reached the Supreme Court, Mr. Justice Brown, speaking for it, said:

"We know of no case where a Legislature has assumed to impose a tax upon land within the jurisdiction of another state, much less where such action has been defended by any court. It is said by this court in the Foreign-held Bond Case, 15 Wall. 300, 319, that no adjudication should be necessary to establish so obvious a proposition as that property lying beyond the

jurisdiction of a state is not a subject upon which her taxing power can be legitimately exercised. The argument against the taxability of land within the jurisdiction of another state applies with equal cogency to tangible personal property beyond the jurisdiction."

It was held that the tax was an attempt by the state to take property without due process of law, in contravention of the Fourteenth Amendment. Union Transit Co. v. Kentucky, 199 U. S. 194, 26 Sup. Ct. 36, 50 L. Ed. 150, 4 Ann. Cas. 493. The Fifth Amendment imposes a like limitation upon the powers of Congress.

Upon the assumption that an income tax is a direct tax, and is levied upon property outside the United States, the plaintiff's reasoning is clear and simple. It is true that, if sound, it carries us farther than is necessary for a decision of this case, for apparently it would deny the right to tax so much of the income of a resident as comes from property located in foreign lands. One adverse criticism upon it is that it is clearly established that since the adoption of the Sixteenth Amendment, an income tax is never a direct tax. The effect of that change in the Constitution was to take a tax upon income derived from sources which had therefore made it a direct tax out of that category, and put it in the class of excises, duties, and imposts. Brushaber v. Union Pacific R. R. Co., 240 U. S. 1–19, 36 Sup. Ct. 236, 60 L. Ed. 493, Ann. Cas. 1917B, 713, L. R. A. 1917D, 414; Stanton v. Baltic Mining Co., 240 U. S. 103–112, 36 Sup. Ct. 278, 60 L. Ed. 546. Moreover, in the case so much relied upon by the plaintiff, namely the Union Transit Co. v. Kentucky, the question of whether a state may validly tax one of its residents upon income from sources outside of its jurisdiction was expressly reserved, and subsequently was answered in the affirmative. Maguire v. Trefry, 253 U. S. 12, 40 Sup. Ct. 417, 64 L. Ed. 739. The case last cited dealt with the income received and enjoyed by a citizen of the commonwealth from intangible personal property, the legal title to which was in a nonresident. Maguire v. Tax Commissioner, 230 Mass. 503, 120 N. E. 162. Nevertheless the plaintiff insists that before the ratification of the Sixteenth Amendment, an income tax, as it was clearly not a capitation tax, was either a direct tax, subject to apportionment among the states, or was an excise, which must be uniform throughout the United States. Brushaber v. Union Pacific, supra. And as already pointed out, the amendment does not make taxable anything which could not have been previously taxed. Evans v. Gore, supra. Before its adoption he contends that he has demonstrated that Congress could not lay a direct tax upon property in foreign countries, and he asserts that it is equally well settled that its authority to impose duties, imposts, and excises was limited to territories of the United States. In U. S. v. Rice, 4 Wheat. 246, 4 L. Ed. 562, argued by Wirt and Webster, and in which Story delivered the opinion of a unanimous court, it was held that merchandise brought into Castine, while that port was held in the military power of the British government during the latter part of the War of 1812, was not liable for duties, although it apparently still existed intact when, at the end of the conflict, the Americans resumed possession.

The overwhelming majority of American citizens are also citizens of some one or the other of the states. The logic, not only of the Union Transit Co. v. Kentucky, supra, but of many other cases as well, and the conclusion of some of the most eminent text-writers, it is argued, negative the power of a state to tax its nonresident citizens upon income derived from property not within its borders, and in the case last specifically referred to, the conclusion was put, in part at least, upon a ground which negatives the existence of an analogous power in the federal government. In so contending, it is probable that the existence of certain important practical differences between the relation of a state and of the United States respectively to their nonresident citizens have been lost sight of. One of our American states has little or nothing it can give to one of its citizens who takes up his residence beyond its borders. If he moves to another one of our states, he practically always changes his citizenship at once. There may be rare and exceptional cases in which he does not; but, if so, it is always within his power to do it when he will, and it is safe to assume that he would do so when the state of his prior allegiance made an attempt to tax him upon income derived from property located in that in which he is living. When he goes abroad, and takes his property with him, as a practical matter, the power of his state to give him anything in return for his taxes ceases. He cannot call upon it for anything which he is likely to want and which it can give. It may not maintain diplomatic relations with the country in which he is living. It has neither an army nor a navy to give moral or physical protection to him. On the other hand, he may demand the protection of the United States, and often does. To a somewhat indefinable extent, he is entitled to it. To be in the position to afford it, the government must maintain diplomatic and consular representatives abroad, and keep up land and sea forces. In easily conceivable cases, the attempt to assert his rights may involve his country in the expenditure of billions of dollars and hundreds of thousands of lives. If he wishes to retain a citizenship which may cost his native land so dearly, it is not altogether unreasonable to require him to contribute to its support. For nearly 60 years Congress has thought that he should. Text-writers of high authority here and abroad have assumed that he may be lawfully called upon to do so. Webster on Citizenship, 163 to 169, and authorities and precedents there cited. More than half a century ago, Hamilton Fish, then Secretary of State, on December 13, 1870, wrote to Mr. MacVeigh, one of our ministers abroad, to the effect that long continuance, by a citizen of the United States, in failures to make income tax returns, would, as a general rule, justify the refusal of a recognition of his claim to protection. Foreign Relations of U. S. 1871-72, 888. The Supreme Court itself has said that it did not in the slightest degree question that there was power to impose an excise duty upon a foreign built yacht owned by a citizen, although he was permanently domiciled abroad. U. S. v. Goelet, supra.

As to the policy of taxing our nonresident citizens upon their foreign located property, minds may differ. It may be said that it scarcely comports with the dignity of the government to impose a tax, the

collection of which it has little power to enforce, and that it is not just to tax a citizen who, because he dwells abroad, ordinarily receives from us little at the same rate which is levied upon those who are in the daily enjoyment of all the benefits the government bestows. Weighty as these arguments may seem to be, they should be addressed to Congress and not to the court.

It follows that the demurrer of the defendant to plaintiff's declaration must be sustained.