## COLONIAL TRUST CO. v. LEWELLYN, Former Collector of Internal Revenue.

## SAME v. HEINER, Collector of Internal Revenue.

(District Court, W. D. Pennsylvania. December 31, 1925.)

Nos. 3271, 3272.

Internal revenue ⬅➡7—Income of lessee from oil leases of Indian tribal lands held not subject to tax.

In the absence of language explicitly so providing, the revenue statutes are not to be construed as authorizing the imposition of a tax upon income derived by a lessee from oil leases of inalienable tribal lands of the Osage Indians, made subject to approval of the Interior Department, since the effect of such taxation would be to impose a burden upon, and lessen the value of, such lands to the Indians, which would be incompatible with the duty of the United States, which as their guardian holds their lands in trust to conserve the same.

At Law. Actions by the Colonial Trust Company, Executor of the will of Glenn T. Braden, deceased, against C. G. Lewellyn, former Collector of Internal Revenue, and against D. B. Heiner, Collector of Internal Revenue. Judgment for plaintiff in each case.

Sterrett & Acheson, of Pittsburgh, Pa., and Allen & Underwood, of Tulsa, Okl., for plaintiff.

John D. Meyer, U. S. Atty., and W. J. Aiken, Asst. U. S. Atty., both of Pittsburgh, Pa., for defendants.

THOMSON, District Judge. These two actions involving the same legal questions are brought by the executor of the last will and testament of Glenn T. Braden, deceased, to recover back the amount of certain taxes assessed on the income of decedent from a certain lease for oil and gas purposes from the Osage Tribe of Indians under lands located in Osage county, Okl. The taxes were paid by the decedent to the respective Collectors of Internal Revenue under protest, to avoid distraint and sale of decedent's property. An affidavit of defense identical in character was filed in each case, and the parties, recognizing that the facts on which plaintiff's right of recovery depends are not in dispute, and that the fundamental questions involved are of law, have filed stipulations of record covering the material facts, leaving the issue, one of law, for the determination of the court. Under the admissions in the pleadings as modified by the stipulations, the following facts appear:

(1) The oil deposits in question in Osage county, Okl., were, and still are, the exclusive property of the Osage Indian Tribe, and in its capacity as a tribe or nation.

(2) The Osage Tribe of Indians have at all times been, and now are, wards of the national government, the relation of the United States as guardian of said tribe rests upon treaty obligations, acts of Congress, and policies adopted by the government in dealing with the tribe, and the tribe has at all times been, and now is, considered by the United States as a dependent people.

(3) From time immemorial all tribal funds and property, including the oil deposits in question, of the Osage Tribe of Indians have been and are held in trust for them as wards of the government of the United States as their guardian, and this status as to these oil deposits will not expire before April 17, 1946. The acts of Congress which deal with these matters are special and not general acts.

(4) Under the terms of this legislation, the setting apart of the land, under which are these oil deposits, was in order to provide the tribe with a reservation, and the same was so set apart for them.

(5) Under this legislation, the oil and other minerals covered by these lands were reserved for said period for the use of the tribe, the royalty in respect thereof to be paid to the tribe, the leases for all oil to be made by the Osage Tribe, through its tribal council, with the approval of the Secretary of the Interior, and under such rules and regulations as he may prescribe, all funds belonging to the tribe, which may become due, or found to be due to the tribe, to be held in trust by the United States.

(6) The rules and regulations which, by the stipulations, are made a part of the statement of claim, are pursuant to the special congressional legislation, and contain a copy of the form of the oil-mining leases.

(7) The United States, by virtue of this guardianship relation, has exercised absolute dominion and control as guardian over these oil deposits, and is, and has been at all times, holding the same in trust for the use and benefit of the Indians, except that the lease, as stated, made pursuant to these acts of Congress, is required by Congress to be executed by the tribal council, but is not valid unless approved by the Secretary of the Interior.

(8) Glenn T. Braden, the decedent, in his lifetime was owner of an interest in such a lease in respect of said oil deposits from a date prior to the year 1917, as oil lessee, under due approval by the Secretary of the

12 F.(2d)—31

Interior, to wit, as to a particular portion of the property of the said tribe, and as described in paragraph 8 of the plaintiff's statement of claim, and, in compliance with the terms of said lease and the rules and regulations of the Department ·of the Interior, Braden controlled a number of oil wells thereon and produced large quantities of oil therefrom.

(9) The royalty which the said Braden, under the terms of said lease, was to pay on the oil produced from the lease was 16⅔ per cent. of the gross proceeds from the sale of the oil produced thereon from wells producing 100 barrels or less, and exceeding that amount, 20 per cent.

(10) Upon threat of the respective collectors to enforce payment of the taxes assessed, with penalties and interest, by distraint and sale of his property, Braden paid the taxes set forth in the statement of claim under protest, no part of which has been refunded.

In these circumstances, the question is, As the law now stands, can the United States lawfully assess and collect from the lessee of the lands of its ward, the Osage Indian Tribe, a tax on the net income arising from such lease?

If the state of Oklahoma were attempting by legislative act to levy a tax for the support of the state from this same net income of the lessee, it would certainly fail. The Supreme Court has distinctly announced certain principles in decisions closely touching the question now before the court, which would not only preclude the state from collecting such tax, but, by analogy, are practically conclusive against the government's claim.

The taxing powers of a state are of the broadest character. This is an incident of sovereignty, and all subjects over which the sovereign powers of a state extend are objects of taxation. Concerning these, the federal government undertakes to exercise no supervision or control, never attempting to interfere unless the state taxation results in national interference. In Shaffer v. Carter, 40 S. Ct. 221, 252 U. S. 37, 64 L. Ed. 445, the Supreme Court, quoting from Justice Brewer in a former case, said:

" 'We have had frequent occasion to consider questions of state taxation in the light of the federal Constitution, and the scope and limits of national interference are well settled. There is no general supervision on the part of the nation over state taxation, and in respect to the latter the state has, speaking generally, the freedom of a sov-

ereign both as to objects and methods.' * * * 'The power of taxation, however vast in its· character and searching in its extent, is necessarily limited to subjects ·within the jurisdiction of the state. These subjects are persons, property, and business. * * * It * * * may touch business in the almost infinite forms in which it is conducted, in professions, in commerce, in manufactures, · and in transportation. Unless restrained by provisions of the federal Constitution, the power of the state as to the mode, form, and extent of taxation is unlimited, where the subjects to which it applies are within her jurisdiction.' "

But, vast as the powers of state taxation are, they must not and cannot interfere with the functions and operations of the federal government.

In Choctaw, Oklahoma & Gulf Railroad Co. v. Harrison, 35 S. Ct. 27, 235 U. S. 292, 59 L. Ed. 234, appellant was a railroad corporation with power to lease and operate coal mines in the region formerly known as Indian Territory, now in the state of Oklahoma. The Choctaw and Chickasaw Indians as wards of the United States owned a large area of segregated and unallotted lands, containing coal deposits which are not subject to taxation by the state. In 1908, the state of Oklahoma passed an act (Laws 1908, c. 71, art. 2) entitled, "An act providing for the levy and collection of a gross revenue tax from * * * persons, firms, corporations or associations engaged in the mining or production of coal." The act subjects every such person, firm, association, or corporation engaged in the mining or production, within the state, of coal, to a gross revenue tax, which was in·addition to the taxes levied and collected on an ad valorem basis upon such mining property, and, the appellant declining to pay the tax assessed upon the gross receipts for sales, the sheriff was about to enforce the demand by levy. The lower court and the Supreme Court of Oklahoma held that the effect of the act was to lay a valid tax on personalty and sustained the levy and assessment. This was reversed by the Supreme Court, that tribunal saying:

"From the foregoing it seems manifest that the agreement with the Indians imposed upon the United States a definite duty in respect to opening and operating the coal mines upon their lands, and appellant is the instrumentality through which this obligation is being carried into effect. Such an agency cannot be subjected to an occupation or privilege tax by a state. McCul-

loch v. Maryland, 4 Wheat. 316, 425 [4 L. Ed. 579]; Farmers' Bank v. Minnesota [34 S. Ct. 354] 232 U. S. 516 [58 L. Ed. 706]. But it is insisted that the statute rightly understood prescribed only an ad valorem imposition on the personal property owned by the appellant—the coal at the pit's mouth —which is permissible according to many opinions of this court."

But the court held that "neither state courts nor Legislatures, by giving a tax a particular name, or by the use of some form of words, can take away our duty to consider its real nature and effect."

The court held the clear purpose of the act is to reach all sales and secure a certain percentage thereon, and in effect the statute prescribes an occupation tax, which, under the statute, the state had no legal power to enforce against the appellant.

In Indian Territory Illuminating Oil Co. v. State of Oklahoma, 36 S. Ct. 453, 240 U. S. 522, 60 L. Ed. 779, the Osage Tribe of Indians made a lease which conferred the privilege of prospecting, drilling wells, mining and producing petroleum and natural gas upon lands in Oklahoma territory. The appellant oil company was assignee of the lease and opposed the claim of Oklahoma that it was subject to tax, asserting that under the lease and assignment it became "a federal agent in the development of the lands of the Indians and that its business, license, or permit as such cannot be taxed by the state government." The Supreme Court held that oil leases of land in Oklahoma made by the Osage Tribe of Indians under authority of the Acts of February 28, 1891 (26 Stat. 794), and March 3, 1905 (33 Stat. 1049), are under the protection of the federal government, and the lessee is a federal instrumentality, and the state cannot, therefore, tax its interest in the leases, either directly or as the leases are represented by the capital stock of the corporation owning them. The court said:

"A tax upon the leases is a tax upon the power to make them, and could be used to destroy the power to make them. If they cannot be taxed as entities, they cannot be taxed vicariously by taxing the stock, whose only value is their value."

The court cited with approval the case of Choctaw & Gulf Railroad v. Harrison, supra, and held that the assessment against the oil company, so far as it included the leases, whether as separate objects of taxation or as represented or valued by the stock of the company, is invalid.

A case identical with the case at bar, ex-cept that the question was as to the power of the state to tax, is Gillespie v. Oklahoma, 42 S. Ct. 171, 257 U. S. 501, 66 L. Ed. 338. Under the laws of Oklahoma every person of the state is made liable to a tax upon his entire net income arising from all sources, except such as is exempt from taxation by some law of the United States or of the state. The state sought to hold the defendant liable for taxes upon the net income derived by him as lessee from leases of restricted Indian lands; the leases being of the same kind as that dealt with in Choctaw & Gulf Railroad v. Harrison, and Indian Territory Illuminating Oil Company v. Oklahoma. The Supreme Court of Oklahoma held the tax valid, reversing the court below. The Supreme Court reversed the judgment. The court cited with entire approval the two cases above referred to, and held that a tax upon the leases is a tax upon the power to make them, and could be used to destroy the power to make them, and that the step from this to the invalidity of the tax upon income from the leases is not long, that the same considerations that invalidate a tax upon the leases invalidate a tax upon the profits of the leases, and that a tax upon such profits is a direct hamper upon the effort of the United States to make the best terms that it can for its wards.

These cases establish beyond controversy the invalidity of such a tax as is levied here if the same were assessed and levied by the state of Oklahoma. Keeping in mind the principles thus enunciated and the reasons upon which they are based, is the tax here sought to be imposed by the federal government against the proceeds of the lands of its ward a valid tax? The question of the limitation of the power of Congress to levy such a tax, if it definitely attempted to legislate for that purpose, is not involved in this controversy. Over taxation Congress has almost unlimited power, and I am not prepared to say that under such power it could not levy a tax upon the lands of its ward, or the proceeds derived from those lands. The real question is, Has Congress attempted to do any such thing through the legislation heretofore enacted? It is conceded that all tribal funds and property of the Osage Tribe, including the oil deposits in question, have been, and are, "inalienable in any form, and subject to no form of incumbrance"; and it is clear that, if the government levied a tax which the Indians were either unable or unwilling to pay, involuntary sale of the property would result. It would seem that to incumber the lands of its ward by

the lien or burden of taxes would be wholly inconsistent with its trust to protect the property of the tribe from all forms of alienation and incumbrance. Under the character of the trust existing between the government and the Osage Tribe, it would seem impossible for the former to subject the lands of the latter to taxation without a clear violation of the trust which it owes to its comparatively defenseless wards.

The question we have is one of intent, of the proper interpretation of the law as it is written. The income tax laws are general statutes, and, on this account, as well as upon other settled principles of interpretation, an intent by implication will not be imputed to Congress to tax the ward for the benefit of the guardian. The very opposite would be assumed, and it would require the most explicit words to manifest an intention on the part of Congress to do this clearly improper thing. It was held in Evans v. Gore, 40 S. Ct. 550, 253 U. S. 245, 64 L. Ed. 887, 11 A. L. R. 519, that the Sixteenth Amendment simply removed obstacles and did not create sources of taxation, and that the function of the Revenue Acts, in pursuance of that amendment, is to reach all recognized sources of taxation, but not to enlarge them. "Any source" clearly means any recognized taxable source, not taxable as a matter of power, but as a matter of intent not to depart from the settled and absolutely just policies of the government toward the Indians as its wards. The Supreme Court has held in many cases that the Indian wards are favored in the interpretation of federal statutes, and it is a well-recognized canon of construction that statutes levying taxes are construed most strongly against the government and in favor of the citizen. That such construction as contended for by the government is not sound is held by Attorney General Sargent in an opinion in relation to the Quapaw Indians, rendered March 20, 1925, approved by the Secretary of the Treasury. The Attorney General there held that there was nothing in the treaty or acts of Congress with respect to the Quapaw Indians in so many words, stating that the Quapaw lands should be free from taxation. But there, as here, the word was "inalienability," and he reached the conclusion that "inalienability" in that case meant

freedom from taxation or interference in any way by the federal government, and in passing noticed that the lands that they had relinquished had not been subject to any such taxation or interference. His conclusion was:

"In order to make this restriction against alienation properly effective, it would seem that inalienability and nontaxability should go hand in hand, at least until Congress clearly provides otherwise. * * * *"

This decision was in harmony with the conclusion of Attorney General Daugherty in an opinion rendered March 15, 1924, and approved by the Secretary of the Treasury. The opinion involved the question whether incomes received by the individual members of the Five Civilized Tribes of Indians from tax-exempt lands, allotted in severalty by the United States, is subject to taxes imposed by the Revenue Acts. In supporting his conclusion that they were not subject to taxation, he used this language:

"While these funds (incomes) are in the hands of the federal government, kept in the United States Treasury, and not paid out or pledged except under the consent of the government, a state has no right to tax them. If a state cannot tax them, the question arises, Is it proper or legal for the federal government to tax them? Is it consistent for it to guard this income from the state taxing power and surrender it to congressional authority? Would such procedure be consistent with its policy toward the Indian as protector and conservator?"

As the exercise of taxing power by Oklahoma might destroy the value of the lands to the Indians, so probably the exercise of like taxing power by the government would have such destructive effect. Braden, the decedent in this case, is not taxed, not because the United States was without power to tax him, but because in the discharge of its obligation as guardian it has refused to exercise such power to the manifest detriment of its wards.

Being of opinion that the power exercised by the government is not supported either on principle or by authority, judgment will be entered for the plaintiff against the collector of internal revenue in each of said cases for the amount set forth in the respective statements of claim, with interest from the several dates when payment was made.