NORRIS, Circuit Judge:
 

 This ease presents a question of substantial constitutional importance: whether a person lacking the essential attributes of an article III judge — life tenure and protection against diminution of compensation — may nonetheless exercise the judicial power of the United States by virtue of a recess appointment made pursuant to article II, section 2 of the Constitution.
 
 [1]
 
 We are thus called upon to address the inherent tension between the so-called recess appointment clause, which on its face applies to vacancies in any government office, and section 1 of article III which provides that only judges with article III protection may exercise the judicial power of the United States.
 
 [2]
 
 We are required to decide, in other words, whether the recess appointment power of the President applies to vacancies in the judicial as well as the executive branch of government.
 

 I
 

 Appellant Janet Woodley was indicted on September 18, 1981, for importing, intending to distribute, and conspiring to distribute heroin in violation of title 21, sections 841(a)(1), 952(a), and 960(b)(1) of the United States Code. Woodley filed motions to suppress evidence allegedly obtained in violation of the fourth amendment. A hearing was held on Woodley’s suppression motions before Judge Walter Heen on November 16, 1981. Judge Heen denied the suppression motions and presided over a bench trial conducted on stipulated facts at which Woodley was found guilty on all three counts.
 
 [3]
 

 Judge Heen had been nominated to fill a judicial vacancy in the district of Hawaii on February 28, 1980. On September 25,1980, the Senate Judiciary Committee began confirmation hearings on Heen’s nomination. Although testimony and hearings were complete, no vote had been taken when the Senate recessed on December 16, 1980. On December 31, 1980, while the Senate was still in recess, President Carter conferred a commission on Heen who then began to sit as a district judge. Less than one month
 
 *1330
 
 later, on January 21, 1981, President Reagan withdrew Heen’s nomination. Heen continued to sit as a district judge, however, until December 16, 1981, when the First Session of the 97th Congress ended. Thus, at the time he ruled on Woodley’s suppression motions and presided over her trial in November and December 1981, Heen sat only by virtue of his recess appointment. During this period, he possessed neither life tenure nor guaranteed compensation — the essential attributes of an article III judge. On appeal this court raised sua sponte the question whether, this fact rendered Heen’s appointment, and hence all recess appointments to the judici-. ary, constitutionally infirm.
 

 Strong arguments can be marshaled both for and against application of the recess appointment ■ clause, to the judiciary. On the one hand, if the recess appointment, clause applies to judicial vacancies, a person may exercise the judicial power without the institutional protections of article III that the Framers considered essential to judicial independence. A judge receiving his commission under the recess appointment clause may be called upon to make politically charged decisions while his nomination awaits approval by popularly elected officials. Such a judge will scarcely be oblivious to the effect his decision may have on the vote of these officials. Professor Freund aptly summarized the problem when he referred to the recess appointee as a judge sitting “with one eye over his shoulder on Congress.” Harvard Law School Record, October 8, 1953, at 1.
 

 Questions of governmental efficiency must, however, also be considered. Application of the recess appointment clause to the judiciary arguably ensures that the nation’s judicial business is not delayed because of lengthy vacancies in judicial office. In this case, for example, two and one-half years passed before a judge enjoying the protections of article III filled the vacancy temporarily occupied by Judge Heen. A mechanism by which judicial offices may be filléd within a reasonable time is obviously of great practical value in assuring the continued smooth operation of the courts.
 

 II
 

 In resolving the conflict between article II and article III we look to the language of the Constitution viewed in light of accepted principles of statutory construction, to the history of both articles, and to the Supreme Court decisions interpreting them. Despite long historical practice to the contrary,
 
 see infra
 
 at 1335, these considerations persuade us that only those judges enjoying article III protections may exercise the judicial power of the United States.
 

 A
 

 Under familiar principles of statutory construction, the very specific language of article III would, absent a countervailing reason, prevail over the general language of article II.
 
 See Busic
 
 v.
 
 United States,
 
 446 U.S. 398, 406, 100 S.Ct. 1747, 1752, 64 L.Ed.2d 381 (1980);
 
 Preiser v. Rodriguez,
 
 411 U.S. 475, 489-90, 93 S.Ct. 1827, 1836-37, 36 L.Ed.2d 439 (1973). Article III states explicitly and unambiguously that the judicial power is to be exercised by those holding “their Offices during good Behavior and ... at stated Times, receiving] for their Services, a Compensation, which shall not be diminished during their Continuance in Office.” U.S. Const. art. Ill, § 1. This language is unusually specific. As Justice Frankfurter noted,
 

 [n]o provisions of the Constitution, barring only those that draw on arithmetic, as in prescribing the qualifying age for a President and members of Congress or the length of tenure of office, are more explicit and specific than those pertaining to courts established under Article III. “The judicial power” which is “vested” in these tribunals and the safeguards under which their judges function are enumerated with particularity. Their tenure and compensation, the controversies which may be brought before them, and the distribution of original and appellate jurisdiction among these tribunals . are defined and circumscribed, not. left at
 
 *1331
 
 large by vague and elastic phrasing. The precision which characterized these portions of Article III is in striking contrast to the imprecision of so many other provisions of the Constitution....
 

 National Mutual Insurance Co. v. Tidewater Transfer Co., Inc.,
 
 337 U.S. 582, 646, 69 S.Ct. 1173, 1209, 93 L.Ed. 1556 (1949) (Frankfurter, J., dissenting).
 

 We cannot disregard such an explicit constitutional requirement, for
 

 when the Constitution ... gives strict definition of power or specific limitations upon it we cannot extend the definition or remove the translation. Precisely because “it is a
 
 constitution
 
 we are expounding,”
 
 M’Culloch v. Maryland,
 
 4 Wheat. 316, 407 [4 L.Ed. 579], we ought not to take liberties with it.
 

 Id.
 
 at 646-47, 69 S.Ct. at 1196. Only an even more explicit constitutional provision could justify disregard of article Ill’s command that the judicial power shall be exercised only by those enjoying article III protection.
 

 The recess appointment clause is not such a constitutional provision. The clause does not mention the judicial branch at all. It is phrased in the most general language, stating only that its provisions apply to “all vacancies that may happen during the recess of the Senate.” U.S. Const. art. II, § 2, cl. 3. This language appears insufficient to overcome the explicit command of article III.
 

 B
 

 Second, a careful examination of the records and writings of the constitutional period leads us to conclude that the Framers did not intend to allow the housekeéping provisions of the recess appointment clause to impinge on their paramount concern for judicial independence.
 

 The experience of the Framers with the colonial judiciary had not been a happy one. Prior to the Glorious Revolution of 1688, English judges had been “lions under the throne,” creatures of the King. The Act of Settlement of 1701 had remedied this situation in England by granting English judges life tenure and undiminishable compensation. But the Act had no effect in the colonies. In their lack of independence from the Executive, the colonial judiciaries remained similar to those of the England of Charles I. Courts were constituted by the colonial governors under authority of the crown. Any attempt by the governors or the colonial assemblies to free judges from royal control was rapidly quashed. E. Russell,
 
 Review of Colonial Legislation
 
 189 (1915). Colonial history is replete with examples of. royal abuse of judicial, power. Judges who did not follow the wishes of the King or royal governor were summarily discharged.
 
 See
 
 Pittman,
 
 The Emancipated Judiciary in America: Its Colonial and Constitutional History,
 
 37 A.B.A.J. 485, 488 & n. 5 (1951) (citing 6
 
 North Carolina Colonial Records
 
 591; 9
 
 New Jersey Archives
 
 321; 7
 
 New York Colonial Documents
 
 476; 11
 
 Board of Trade Journal
 
 229-233). The signers of the Declaration of Independence charged that the King
 

 obstructed the administration of justice by refusing his assent to laws for establishing judiciary power. He has made judges dependent on his will alone for the tenure of their office and the amount and payment of their salaries.
 

 The Declaration of Independence para. 13 (U.S.1776).
 

 In reaction to the excesses of the colonial courts, the Framers emphasized strongly and repeatedly the need for ah independent judiciary. Hamilton, for instance, stated:
 

 [I] agree that “there is no liberty, if the power of judging be not separated from the legislative and executive powers.” And it proves, in the last place, that as liberty can have nothing to fear from the judiciary alone, but would have every thing to fear from its union with either of the other departments; that as all the effects of such an union must ensue, from a dependence of the former on the latter, notwithstanding a nominal and apparent separation; that as from the natural feebleness of the judiciary, it is in continual jeopardy of being overpowered, awed or influenced by its coordinate branches;
 
 *1332
 
 and that as nothing can contribute so much to its firmness and independencé, as permanency in office, this quality may therefore be justly regarded as an indispensable ingredient in its constitution; and in a great measure as the citadel of the public justice and the public security.
 

 The complete independence of the courts of justice is peculiarly essential in a limited Constitution.
 

 The Federalist No. 78, at 523-24 (A. Hamilton) (J.E. Cooke ed. 1961). To translate their concern for judicial independence into practice, the Framers included in article III the requirement that federal judges have life tenure and undir.dnishable compensation. The Framers recognized that these protections had freed the English judges from royal control. Pittman,
 
 sapra,
 
 at 485. The Framers similarly sought to make the federal judges servants not of the Executive but only of their consciences.
 

 Yet the Framers also recognized, in adopting the recess appointment clause, the need to ensure the continued functioning of government when vacancies in office occurred. Article II, section 2 was thus adopted as a housekeeping measure. It provided that the President could fill vacancies in government that occurred during a recess of the Senate by granting a temporary commission which would expire at the end of the next Senate session.
 

 .The Framers, however, apparently never explicitly addressed the question whether the recess appointment clause applied to the judicial branch. The clause was proposed just ten days before the end of the Constitutional Convention and adopted without debate. 2 Farrand,
 
 Records of the Constitutional Convention,
 
 540 (1937); C. Rossiter,
 
 1787: The Grand Convention
 
 224 (1966). There is no evidence in any of the extant records of the Constitutional Convention or of the various state conventions that the Framers intended the recess appointment clause to apply to the judiciary.
 
 See
 
 Farrand,
 
 supra;
 
 J. Strayer,
 
 The Delegate from New York
 
 (1939) (Constitutional Convention Notes of John Lansing, Jr.); James H. Hutson, “John Dickinson at the Federal Constitutional Convention,” 40
 
 William and Mary Quarterly
 
 256 (1983); J. Elliot,
 
 The Debates in the Several State Conventions on the Adoption of the Federal Constitution,
 
 5 vols. (1901). In fact, research into the origins of the clause has uncovered only sparse evidence that the Framers gave any thought to it at all.
 

 The government argues, however, that at least two sources,
 
 The Federalist
 
 and a letter written after the Constitutional Convention by Edmund Randolph, the governor of Virginia, indicate clearly that the Framers intended that the President’s power under' the recess appointment clause extend to the judiciary. The government cités
 
 The Federalist,
 
 Nos. 67 and 76, for “Hamilton’s view” that “this latter ‘auxiliary method of appointment’ relates to ‘all vacancies’ in offices described in article II’s general appointments clause and is ‘nothing more than a supplement to the other.’ ”
 
 The Federalist,
 
 No. 67, however, does not concern the judiciary at all. Rather, Hamilton in No. 67 refuted those Anti-federalists who sought to discredit the Constitution with the claim that the recess appointment clause enabled the President to make interim appointments to the Senate.
 
 See
 
 J. Story, 3
 
 Commentaries on the Constitution of the United States
 
 410 (1833). Hamilton argues only that the scope of the recess appointment clause does not extend beyond the parameters delineated in the clause immediately preceding. He nowhere discusses the different question whether recess appointments may be made to every office mentioned in that clause.
 

 In fact, there is no consideration given in any of
 
 The Federalist
 
 papers to the relationship between the federal judiciary and the recess appointment power of the President. The government cites
 
 The Federalist,
 
 No. 76, despite the fact that No. 76 makes no mention of the judicial branch of government or of the recess appointment clause, other than to quote verbatim the clause itself.
 
 The Federalist,
 
 No. 78, does indeed say that the “mode of appointing the judges ... is the same” as that “fully discussed in the two last numbers” concerned
 
 *1333
 
 with the appointment of the other federal officers. Yet “the two last numbers” of
 
 The Federalist,
 
 Nos. 76 and 77, include no reference to the recess appointment clause other than its quotation at the outset of No. 76. Hamilton’s silence on this issue lends support to the view that the Framers considered the recess appointment clause a mere housekeeping measure.
 

 The sole reference in the historical record to the Framers’ views about the relationship between the federal judiciary and the recess appointment clause comes in Edmund Randolph’s letter to the Virginia House of Delegates explaining his reasons for declining to add his signature to the proposed Constitution transmitted to the states by the Constitutional Convention. 3 Farrand,
 
 supra,
 
 at 123, 127. In that letter, Randolph argues that the Constitution had created an excessively powerful Executive, citing as partial evidence for this view his belief that the recess appointment clause gave the President the power of conferring judicial commissions during the recess of the Senate. There is no evidence, however, that Randolph’s comments about the recess appointment clause in this letter represented anything other than the temporary position of a volatile political figure whose “gyrations” regarding both the value and meaning of the Constitution are well known to historians.
 
 See,
 
 J. Main,
 
 The Anti-Federalists: Critics of the Constitution, 1781-1788
 
 257 (1961). By the time of the Virginia state convention on the Constitution, Randolph had so far banished his earlier doubts regarding the Constitution that he had actually become one of its “staunchest supporters.” G. Bancroft,
 
 History of the Formation of the Constitution of the United States
 
 427 (1885). Contrary to the impression created by his letter, Randolph stated at the Virginia convention that the powers of the President were in all respects carefully circumscribed: “He can do no important act without the concurrence of the Senate.” 3 Elliot,
 
 supra,
 
 at 201. He attacked the provisions for the appellate jurisdiction of the federal judiciary, but he maintained that judicial independence had been adequately guaranteed.
 
 Id.
 
 at 205. Despite the fact that Randolph consistently highlighted the flaws in the Constitution for the benefit of his fellow members of the Virginia state convention, he never mentioned the recess appointment clause, even on the day the clause was read aloud to the Virginia convention. In fact, the Virginia convention did not discuss the clause at all.
 
 Id.
 
 at 496, 570. As at the other state conventions, the only doubts raised at the Virginia convention about the independence of the judiciary stemmed from the fact that the Constitution did not prohibit augmentation of judicial salaries, not from the recess appointment clause.
 
 Id.
 
 at 517.
 

 Thus, the sparse legislative history regarding the recess appointment clause teaches us little about the intent of the Framers. We are certainly unpersuaded that the available evidence indicates that the Framers envisioned that judges holding temporary appointments could properly exercise article III powers.
 

 The recess appointment clause was apparently modeled on a similar provision in the South Carolina Constitution of 1778. C. Warren,
 
 The Making of the Constitution
 
 530-31 (1929). That constitution provided that South Carolina ordinaries, the equivalent of judges, were to be chosen by a joint vote of the state House and Senate and were to have tenure during good behavior. S.C. Const. art. XXIV (1778). The South Carolina Constitution provided also that the Governor could make a recess appointment to any vacancy in an office to be filled by vote of the state legislature. The appointee would hold office until the next election to the state legislature. S.C. Const. art. XXVI (1778). There is evidence that the South Carolina recess appointment clause was not intended to apply to judicial offices. The South Carolina legislature passed legislation in 1815 authorizing the Governor to make temporary appointments to the office of ordinary.
 
 State v. Hutson,
 
 12 S.C.L. (1 McCord) 240 (Const.Ct.1821). Such legislation would have been unnecessary if ordinaries had been covered by the recess appointment clause of the Constitution of 1778.
 

 
 *1334
 
 C
 

 The final reason for concluding that the recess appointment clause does not permit judges lacking article III protection to exercise article III power is that Supreme Court precedent seems to mandate that result.
 

 The Supreme Court has long emphasized the overriding importance of an independent judiciary. In 1920, the Court considered whether application of the federal income tax to the salaries of federal judges constituted diminution of income.
 
 Evans v. Gore,
 
 253 U.S. 245, 40 S.Ct. 550, 64 L.Ed. 887 (1920). The Court, quoting Washington, Hamilton, Marshall, and Wilson at great length, concluded that “independence of action and judgment”
 

 is essential to the maintenance of the guaranties, limitations and pervading principles of the Constitution and to the administration of justice without respect to persons and with equal concern for the poor and the rich.
 

 Id.
 
 at 253, 40 S.Ct. at 553. The Court stressed that, in order to ensure the integrity of the judiciary, judges must not only be independent of outside influence in fact, but must also be “above even the suspicion of any influence.”
 
 Id.
 
 at 257, 40 S.Ct. at 554 (quoting Chief Justice Taney in letter to Secretary of Treasury). Thirteen years later, in
 
 O’Donoghue v. United States,
 
 289 U.S. 516, 53 S.Ct. 740, 77 L.Ed. 1356 (1933), the Court stated that
 

 the acts of each [department should] never be controlled by, or subjected, directly or indirectly, to, the coercive influence of either of the other departments. James Wilson, one of the framers of the Constitution and a justice of this court, in one of his law lectures said that the independence of each department required that its proceedings “should be free from the remotest influence, direct or indirect, of either of the other two powers.”
 

 Id.
 
 at 530, 53 S.Ct. at 743. Other cases contain similar language.
 
 See, e.g., American Insurance Co. v. Canter,
 
 26 U.S. (1 Pet.) 511, 545, 7 L.Ed. 242 (1828) (courts whose judges do not have article III protection are “incapable of receiving” the judicial power conferred by the Constitution on the judicial branch of government).
 

 The preeminence of the constitutional requirement that article III power may not be exercised by judges lacking article III protection has been reemphasized in two more recent cases in which the Court held unconstitutional statutory schemes designed to promote judicial efficiency. In
 
 Glidden Co. v. Zdanok,
 
 370 U.S. 530, 82 S.Ct. 1459, 8 L.Ed.2d 671 (1962), the question presented was whether Joseph Jackson, a judge of the United States Court of Customs and Patent Appeals, could preside over a criminal trial in a United States District Court. Jackson sat by virtue of 28 U.S.C. § 294(d) (1976) which authorizes' retired judges to sit by designation of the Chief Justice on either the courts of appeals or the district courts. Lurk, the defendant, alleged that as a member of the Court of Customs and Patent Appeals, Judge Jackson enjoyed only statutory assurance of tenure and compensation. Thus, Lurk claimed, in being tried by such a judge he had been “denied protection of judges with tenure and compensation guaranteed by Article III.”
 
 Id.
 
 at 533, 82 S.Ct. at 1464.
 

 The Court held that Judge Jackson could preside over Lurk’s trial because the Court of Customs and Patent Appeals was, in fact, a court constituted under article III whose judges enjoyed article III protection. The opinion strongly indicates that had the Court not found that Judge Jackson enjoyed the constitutional protections of life tenure and undiminished compensation it would have reached a contrary result. The Court first noted that the “necessity for an [article III] judge is uncontested.”
 
 Id.
 
 at 537, 82 S.Ct. at 1466. Regardless whether Lurk’s trial was conducted fairly, the Court held,
 

 Article III, § 1 ... is explicit and gives the petitioners ... a basis for complaint without requiring them to point to particular instances of mistreatment in the record.
 

 Id.
 
 at 533, 82 S.Ct. at 1464. The essential question, therefore, was not whether 28 U.S.C. § 294(d) provided a useful mecha
 
 *1335
 
 nism by which to lessen the workload of the district courts. The question, instead, was whether the members of courts from which § 294(d) judges were drawn enjoyed article III protections. Thus, the Court held that only upon a determination that they did enjoy such protections would they be allowed to exercise article III powers.
 

 In
 
 Northern Pipeline Construction Co. v. Marathon Pipeline Co.,
 
 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), the Court once again stressed the importance of judicial independence in the constitutional scheme. That case presented a challenge to the constitutionality of the Bankruptcy Reform Act of 1978, which granted to judges without article III protection jurisdiction over all bankruptcy matters. Bankruptcy judges were appointed for fourteen year terms, could be removed by the judicial council of the circuit in which they sat on grounds of “incompetence, misconduct, neglect of duty or physical or mental disability,” and were not protected from salary diminution by Congress.
 
 Id.
 
 102 S.Ct. at 2862. The appellees claimed that they were thus not article III judges and could not exercise article III power.
 
 Id.
 
 at 2864.
 

 The
 
 Marathon
 
 Court, in a plurality opinion by Justice Brennan, held that Congress could not delegate article III powers to the bankruptcy courts without granting the judges of those courts article III protection. In dissent, Justice White argued strongly that Congress, in creating the bankruptcy courts, had created an efficient, workable system to address an increasingly pressing problem.
 
 Id.
 
 at 2894-2896. Without disputing the worthiness of Congress’ goals or the efficiency of the system Congress had designed, the plurality stated unequivocally:
 

 The inexorable command of [article III] is clear and definite: The judicial power of the United States must be exercised by courts having the attributes prescribed in Art. III. Those attributes are also clearly set forth:
 

 “The Judges, both of the supreme and inferior Courts, shall hold their Offices during good Behavior and shall, at stat-
 

 ed Times, receive for their Services, a Compensation, which shall not be diminished during their Continuance in Office.” Art. Ill, § 1.
 

 Id.
 
 at 2865. The plurality specifically tied its holdings to the mandate of the Constitution that the federal courts be absolutely independent. It noted:
 

 In sum, our Constitution unambiguously enunciates a fundamental principle — that the “judicial Power of the United States” must be reposed in an independent Judiciary. It commands that the independence of the Judiciary be jealously guarded, and it provides clear institutional protections for that independence.
 

 Id.
 
 at 2866. Because the Bankruptcy Act vested judicial power in judges without article III protection it violated the constitutional command that such power be vested only in judges who enjoy those safeguards. Thus,
 
 Marathon
 
 clearly demonstrates that the imperatives of article III take precedence over a statute providing an indisputably efficient solution to a pressing judicial problem.
 
 See also Pacemaker Diagnostic Clinic of America, Inc. v. Instromedix, Inc.,
 
 712 F.2d 1305 (9th Cir.1983),
 
 reh’g en banc granted,
 
 718 F.2d 971 (9th Cir.1983).
 

 In sum, the plain language of the Constitution, the history of the adoption of article II and article III, and decisions of the Supreme Court emphasizing in the strongest terms the necessity of a judiciary independent both in fact and in appearance all demand that we adhere strictly to the constitutional command that only those who enjoy article III protections may exercise article III power. The government argues, however, that the long and accepted practice of recess appointments to article III courts has created a “historical consensus” that judicial appointments made pursuant to the recess appointment clause are not subject to the requirements of article III. It is to that argument that we now turn.
 

 IV
 

 The recess appointment clause was used with some frequency to fill judicial vacancies during the late eighteenth and early
 
 *1336
 
 nineteenth centuries. By the end of 1823, five recess appointments had been made to the Supreme Court while twenty had been made to the inferior federal courts. Chief Justice Rutledge not only sat on the Supreme Court by virtue of a recess commission but also authored a decision of the Court before his confirmation by the Senate.
 
 See United States v. Peters,
 
 3 U.S. (3 Dall.) 120, 1 L.Ed. 535 (1795) (Rutledge, J.). No evidence exists that the constitutional propriety of these appointments was ever questioned. This fact suggests that recess appointments to the judiciary, if not contemplated or explicitly sanctioned by the Framers, were nonetheless not considered highly objectionable by them. As one author has noted:
 

 During this period, when those who wrote the Constitution were alive and active, not one dissenting voice was raised against the practice. It would seem that the framers must have looked upon recess appointments as an exceptional expedient to fill vacancies on the Court and not as a violation of article III.
 

 Note,
 
 Recess Appointments to the Supreme Court
 
 — Constitutional
 
 But Unwise?
 
 10 Stan.L.Rev. 124, 132 (1957).
 

 Recess appointments were made to the .. federal judiciary as frequently after the constitutional period as during it. In all, 283 recess appointments were made to the federal bench — six of those to the Supreme Court — between 1823 and 1964. The practice, however, fell into disuse a generation ago. Judge Heen’s appointment in 1980 was the only recess appointment in the past twenty years.
 
 See
 
 Appellee’s Second Supplemental Brief at A1-A25.
 

 Executive acceptance of the power to make recess appointments to the judiciary is evidenced not only by frequent use of the power, but also by some twenty four opinions of the attorneys general. That of Attorney General Stanberry in 1868 is one of the more elaborate:
 

 For it seems a greater evil to be without officers altogether, than to have officers who hold only by the temporary appointment of the President. I say by the
 

 temporary
 
 appointment of the President, for, in strict language, the President cannot invest any officer with a full title to the office without the concurrence of the Senate. Whether the President appoints in the session or in the recess, he cannot and does not
 
 fill the office
 
 without the concurrence of the Senate. He may
 
 fill the vacancy
 
 in the recess, but only by an appointment which lasts until the end of the next session.
 

 For instance, in filling a vacancy in the office of judge, whose tenure is in effect for life, his appointee can only hold for a fraction of time.
 

 12 Op.Atty.Gen. 82, 41 (1868) (emphasis in original).
 

 Congressional acceptance of presidential power to make recess judicial appointments is equally indisputable. The statute authorizing the payment of recess appointees to all offices makes no exception for judges, and Senator Philip Hart, in support of a resolution requesting the President to use his recess appointment power sparingly in filling judicial vacancies, noted that
 

 [i]f there ever was ground for the argument that the more specific language of Article III of the Constitution would be construed as excluding judiciary appointments from the general authorization given the President in Article II, time has answered it. The President does have that power and this Resolution does not argue otherwise.
 

 106 Cong.Rec. 18,130 (1960).
 

 Thus, both Congress and the Executive have long accepted the power of the President to make recess appointments to the federal bench. But while the members of both the legislative and executive branches are sworn to uphold the Constitution, the courts alone are the final arbiters of its meaning.
 
 United States v. Nixon,
 
 418 U.S. 683, 703, 94 S.Ct. 3090, 3105, 41 L.Ed.2d 1039 (1974);
 
 Marbury v. Madison, 5
 
 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803). The question before us, then, is what weight to attach to these legislative and executive interpretations of the scope of
 
 *1337
 
 presidential power to make recess appointments.
 

 Early Supreme Court authority suggested that great weight was to be given to historical practice. In
 
 Stuart v. Laird,
 
 5 U.S. (1 Cranch) 298, 2 L.Ed. 115 (1803), the Court considered the question whether judges of the Supreme Court could sit as circuit judges without having a separate commission to sit on the circuit court. The Court held that
 

 practice, and acquiescence under it, for a period of several years, commencing with the organization of the judicial system, affords an irresistible answer, and has indeed fixed the construction. It is a contemporary interpretation of the most forcible nature. This practical exposition is too strong and obstinate to be shaken or controlled. Of course, the question is at rest, and ought not now to be disturbed.
 

 Id.
 
 at 308.
 

 The view that a long and continuous practice is entitled to a presumption of constitutionality gained further currency in the early part of this century. Several Supreme Court cases during this period considered historical practice in resolving constitutional questions.
 
 [4]
 
 The Court best enunciated the theory of these decisions in
 
 United States v. Midwest Oil Co.,
 
 236 U.S. 459, 472-73, 35 S.Ct. 309, 312-13, 59 L.Ed. 673 (1915), stating that
 

 government is a practical affair intended for practical men. Both officers, lawmakers and citizens naturally adjust themselves to any long-continued action of the Executive Department on the presumption that unauthorized acts would not have been allowed to be so often repeated as to crystallize into a regular practice.
 

 This early line of Supreme Court authority, holding that unchallenged historical practice is sufficient evidence of constitutionality, no longer, however, represents the thinking of the Court. Recent Supreme Court discussions of the issue indicate that any practice, no matter how fully accepted or efficient, is “subject to the demands of the Constitution which defines powers and ... sets out just how those powers are to be exercised.”
 
 INS v. Chadha,
 
 - U.S. -,-, 103 S.Ct. 2764, 2781, 77 L.Ed.2d 317 (1983).
 

 In
 
 INS v. Chadha,
 
 the Court considered the constitutionality of a statute authorizing one house of Congress to invalidate by resolution a decision of an agency of the executive branch made pursuant to congres-sionally delegated authority. At the time the Court decided
 
 Chadha,
 
 the practice of including a one-house veto provision in .legislation had become so common as to have indisputably become a practice of long and continuous acceptance. As the dissent noted,
 

 over the past five decades, the legislative veto has been placed in nearly 200 statutes. The device is known in every field of governmental concern: reorganization, budgets, foreign affairs, war powers, and regulation of trade, safety, energy, the environment and the economy.
 

 Id.
 
 at -, 103 S.Ct. at 2793 (White, J, dissenting) (footnote omitted). Moreover, the practice of one-house vetoes, accepted as constitutional by Presidents since World War II,
 
 id.,
 
 had become a central tool of the legislative process. It was more than “efficient, convenient, and useful.” It was “an important if not indispensable political invention that allows the President and Congress to resolve major constitutional and policy differences, assures the accountability of independent regulatory agencies, and preserves Congress’ control over lawmaking.”
 
 Id.
 
 at-, 103 S.Ct. at 2795.
 

 Yet, this historic acceptance of the one-house veto did not prevent the Court from holding the practice unconstitutional. In fact, Chief Justice Burger noted for the majority that “our inquiry is sharpened rather than blunted by the fact that Congressional veto provisions are appearing
 
 *1338
 
 with increasing frequency in statutes which delegate authority to executive and independent agencies.”
 
 Id.
 
 at-, 103 S.Ct. at 2781. The Court stated that, regardless of historical practice, “policy arguments Supporting even useful ‘political inventions’ are subject to the demands of the Constitution which defines powers and, with respect to this subject, sets out just how those powers are to be exercised.”
 
 Id.
 

 The Court also dispensed quickly , with arguments based on governmental efficiency. Claims that the one-house veto had become central in the relationship between the President and Congress would not override constitutional commands. Chief Justice Burger stated emphatically that
 

 [convenience and efficiency aré not the primary objectives — or the hallmarks — of democratic government....
 

 The choices we discern as having been made in the Constitutional Convention impose . burdens on governmental processes that often seem clumsy, inefficient, even unworkable, but those hard choices were consciously made by men who had lived under a form of government that permitted arbitrary governmental acts to go unchecked. There is no support in the Constitution or decisions of this Court for the proposition that the cumbersomeness and delays often encountered in complying with explicit Constitutional standards may be avoided, either by the Congress or by the President.
 
 See Youngstown Sheet & Tube Co. v. Sawyer,
 
 343 U.S. 579 [72 S.Ct. 863, 96 L.Ed. 1153] (1952). With all the obvious flaws of delay, untidiness, and potential for abuse, we have not yet found a better way to preserve freedom than by making the exercise of power subject to the carefully crafted restraints spelled out in the Constitution.
 

 Id.
 
 at-, --, 103 S.Ct. at 2780, 2788.
 

 The teaching of
 
 Chadha
 
 is clear. Historical acceptance and governmental efficiency are not unimportant. They will not, however, “save [a practice] if it is contrary to the Constitution.”
 
 Id.
 
 at-, 103 S.Ct. at 2781. It is undisputed that the practice of recess appointments to the judiciary is widely accepted and may, in some situations, contribute to judicial efficiency. Such appointments, however, offend the explicit and unambiguous command of article III that the judicial power be exercised only by those enjoying life tenure and protection against diminution of compensation. A practice condemned by the Constitution cannot be saved by historical acceptance and present convenience.
 
 [5]
 
 We therefore
 
 *1339
 
 hold that because he lacks the essential attributes of an article III judge, a recess appointee to the federal bench cannot exercise the judicial power of the United States.
 

 We recognize that the only other court to consider the question we decide today reached a result contrary to ours. In
 
 United States v. Allocco,
 
 305 F.2d 704 (2d Cir. 1962), the Second Circuit held that article III does not require the exclusion of judicial offices from the scope of the recess appointment clause. It based this conclusion in part on historical practice and in part on the need for governmental efficiency.
 
 Id.
 
 at 708-709. But
 
 INS v.
 
 Chadha,-U.S. at-, 103 S.Ct. at 2780, decided over two decades after
 
 Allocco,
 
 makes it clear that even consistent acceptance of a practice over many years will not suffice to render an unconstitutional action constitutional. In addition, other recent Supreme Court cases demonstrate that the article III requirement of judicial independence outweighs arguments made in the name of efficiency.
 
 See Northern Pipeline Construction Co. v. Marathon Pipeline Co.,
 
 102 5.Ct. at 2865-2866;
 
 Glidden Co. v. Zdanok,
 
 370 U.S. at 533, 82 S.Ct. at 1463.
 

 We believe the
 
 Allocco
 
 decision also reflects a misapplication of accepted principles of statutory and constitutional construction. The Second Circuit’s opinion implies that the general language of the recess appointment clause takes precedence over the specific language of article III.
 
 United States v. Allocco,
 
 305 F.2d at 708. Precedent is to the contrary. The unusually specific language of article III must supersede the general language of the article II recess appointment clause, which does not mention the judicial office at all.
 
 See supra
 
 at 1330,1331.
 

 Finally,
 
 Allocco
 
 rests on an overly limited view of the historical record. The Second Circuit commented that “the evils of legislative and executive coercion which petitioner foresees have no support in our nation’s history.”
 
 United States v. Allocco,
 
 305 F.2d at 709. In fact, the Framers themselves were profoundly influenced by the sorry history of a colonial judiciary which lacked the most basic requisites of judicial independence. The Framers based their judgments regarding the protections required in article III on the experience of the colonies and of England. It is precisely because of their command in article III that the “coercion” which the Second Circuit finds absent in more recent history has generally not troubled the federal judiciary.
 
 See supra
 
 at 1331.
 

 Thus, we reject the holding of
 
 Allocco
 
 and find that a recess appointee to the federal bench cannot exercise the judicial power of the United States.
 
 [6]
 

 The conviction is VACATED and the case remanded to the United States District Court for the District of Hawaii. •
 

 [1]
 

 . The recess appointment clause provides:
 

 The President shall have Power to fill up all Vacancies that may happen during the Recess of the Senate, by granting Commissions which shall expire at the End of their next Session.
 

 U.S. Const, art. II, § 2.
 

 [2]
 

 . The relevant portion of article III provides:
 

 The Judges, both of the supreme and inferior Courts, shall hold their Offices during good Behavior, and shall, at stated Times, receive for their Services, a Compensation, which shall not be diminished during their Continuance in Office.
 

 U.S. Const, art. Ill, § 1.
 

 [3]
 

 .We note that the Judgment and Probation Commitment Order was issued not by Judge Heen but by Judge Martin Pence. The government does not argue that that fact should affect our treatment of the issues in this case. In any event, we believe that it would not.
 

 [4]
 

 .
 
 See, e.g., Myers v. United States,
 
 272 U.S. 52, 175, 47 S.Ct. 21, 45, 71 L.Ed. 160 (1926);
 
 Ex parte Grossman,
 
 267 U.S. 87, 118, 45 S.Ct. 332, 336, 69 L.Ed. 527 (1925);
 
 Fairbank v. United States,
 
 181 U.S. 283, 307, 21 S.Ct. 648, 657, 45 L.Ed. 862 (1901).
 

 [5]
 

 . The government argues that the recent decision of the Supreme Court in
 
 Marsh v. Chambers,
 
 — U.S.-, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983), dictates that we accord controlling weight to the fact that recess appointments to ' the judiciary were made during the early constitutional period. We disagree.
 

 In
 
 Marsh,
 
 the Court was faced with the ques-tiori whether the practice of the Nebraska legislature of opening each of its sessions with a prayer offered by a state-paid chaplain violated the establishment clause. In holding that legis- ' lative prayer does not offend the first amendment, the Court relied on a uniquely full historical record indicating that the practice was extensively considered and approved by the Founding Fathers. We- have no such récord in this case.
 

 The first legislative chaplain was appointed during the first Congress. Indeed, three days before final agreement was reached on the language of the Bill of Rights, Congress enacted legislation providing for the appointment of a chaplain. That- legislation was not adopted lightly. An extensive debate took place in Congress. The bill to appoint chaplains drew opposition from both John Jay and John Rutledge on the ground that the delegates “were so divided in religious sentiments ... that [they] could not join in the same act of worship.”
 
 Id.
 
 103 S.Ct. at 3335. The Court in
 
 Marsh
 
 cited this record of debate and opposition as evidence that the “subject was considered carefully and the action not taken thoughtlessly.”
 
 Id.
 
 The relationship between the first amendment and the practice of legislative prayer in the thought of the first amendment draftsmen was thus fully illuminated in the record before the Court in
 
 Marsh.
 

 In striking contrast, there is no evidence that the Framers ever considered the question whether the recess appointment clause applied to judicial appointments. The clause was adopted without debate, and the provision of the South Carolina constitution upon which it was modeled did not apply to judicial vacancies. In
 
 Marsh,
 
 the Court states that it “accepts] the interpretation of the First Amendment draftsmen” regarding the practice of legislative prayer and the establishment
 
 *1339
 
 clause.
 
 Id.
 
 We have no comparable record of explicit interpretation and debate before us. Mute acquiescence is clearly distinguishable from the affirmative contemporaneous construction of the first amendment available to the Court in
 
 Marsh.
 

 [6]
 

 . The issue of whether our holding should be applied retroactively or merely prospectively is not properly before us and should not be decided today. We leave that issue for another day.
 
 See, e.g., Michigan v. Payne,
 
 412 U.S. 47, 93 S.Ct. 1966, 36 L.Ed.2d 736 (1973) (determining whether or not to give retroactive effect to a rule formulated.in an earlier decision);
 
 Robinson v. Neil,
 
 409 U.S. 505, 93 S.Ct. 876, 35 L.Ed.2d 29 (1973) (same);
 
 Stovall v. Denno,
 
 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967) (same);
 
 Tehan v. Shott,
 
 382 U.S. 406, 86 S.Ct. 459, 15 L.Ed.2d 453 (1965) (same);
 
 Johnson v. New Jersey,
 
 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966) (same);
 
 Linkletter v. Walker,
 
 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1964) (same).