Spencer WILLIAMS, et al., Plaintiffs,

v.

UNITED STATES of America, Defendant.

No. CIV. A. 97–3106(JGP).

United States District Court, District of Columbia.

July 15, 1999.

John S. Guttmann, Jr., Beveridge & Diamond, P.C., Washington, DC, Kevin M. Forde, Richard J. Prendegast, Janice R. Forde, Chicago, IL, Plaintiffs.

Neil H. Koslowe, U.S. Dept. of Justice, Washington, DC, Carter G. Phillips, Sidley & Austin, Washington, DC, for U.S.

### *OPINION*

JOHN GARRETT PENN, District Judge.

The plaintiffs, twenty United States District Court judges appointed pursuant to Article III of the Constitution of the United States, filed this case as a class action seeking to have the Court declare that Section 140 of Pub.L. No. 97–92 (Section 140) does not operate to prevent the payment of Employment Cost Index (ECI) adjustments due federal judges under the Ethics Reform Act of 1989 (Pub.L. No. 101–194, 103 Stat. 1716)(now codified at 5 U.S.C. § 5318, note), sometimes hereinafter referred to as the "1989 Act," "because: (1) Section 140 expired on September 30, 1982; or (2) the provisions of Section 140 were superseded by the Ethics Reform Act of 1989 or, (3) the salary adjustments payable by operation of the Ethics Reform Act have been 'authorized by Act of Congress hereafter enacted' within the meaning of Section 140." Otherwise, the plaintiffs ask the Court to declare "that Section 140 is unconstitutional or void." The case is before the Court on plaintiffs' **Motion for Summary Judgment** and defendant's **Motion for Summary Judgment**. The parties agree that there are no genuine issues of material fact. Fed.R.Civ.P. 56. The Court certified this case as a class action. *See* Fed.R.Civ.P. 23.

### I

Article III, Section 1 of the Constitution provides, in pertinent part, that judges of the United States Courts "shall hold their Offices during good Behaviour, and shall, at stated Times, receive for their Services, a Compensation which shall not be diminished during their Continuance in Office." (The Compensation Clause). The compensation of a federal district judge, appointed pursuant to Article III, is defined, in part, at 28 U.S.C. § 135, which provides in pertinent part: "Each judge of a district court of the United States shall receive a salary at an annual rate determined under Section 225 of the Federal Salary Act of 1967 (2 U.S.C. §§ 351–361) (Salary Act) as adjusted by" 28 U.S.C. § 461, of the Executive Salary Cost–of–Living Adjustment Act (Adjustment Act). The plaintiffs contend that the Adjustment Act, as amended by the Ethics Reform Act, requires that the salary of a federal judge be adjusted annually pursuant to an index set forth in the 1989 Act. The plaintiffs note that the adjustment is subject to one condition only, that there be in the same fiscal year an adjustment in the rates of pay of positions covered by the General Schedule determined under the Federal Pay Comparability Act of 1970, Pub.L. No. 91–656, 84 Stat.1946 (1971), codified at 5 U.S.C. 5305–5306 (Comparability Act). The Comparability Act is the mechanism for annually adjusting the rates of pay of most federal employees to reflect increases in the cost of living and salary increases in the private sector.

In the Ethics Reform Act, Congress revised the pay system for high-ranking government officials, including federal judges. The Act changed the method by which the salary of federal judges would be periodically reviewed by the Commission, im-

posed severe limitations on the outside income judges can earn, forbade receipt of honorariums and provided a new mechanism for annual adjustments to judges' pay. The Ethics Reform Act provided that each judge would receive a base salary increase, effective January 1, 1991. Relevant to the contentions of the plaintiffs, the Act provided that, beginning in 1991 and in each subsequent year, the salary of a federal judge shall be adjusted based upon a specific schedule and index. Under the Act, in any year in which salaries of General Schedule employees are adjusted under the Comparability Act, federal judges' salaries are to be adjusted by an amount equal to one-half of one percent less than the percentage change in the ECI for the period ended December of the previous year. Ethics Reform Act, § 704(a)(1)(B). The statute also provides a five percent cap on any adjustment per year. Thus, according to the plaintiffs, the law makes the ECI adjustment automatic, the only condition being that there must be an adjustment in the rates of pay for General Schedule employees in the same year. Absent an adjustment for General Schedule employees, there is no adjustment for the judges.

The federal judges' salaries were adjusted pursuant to the Ethics Reform Act on the first day of January 1991, 1992 and 1993. In 1994, there was no adjustment for General Schedule employees and as a result no adjustment for the judges. There were ECI adjustments for General Schedule employees in 1995, 1996 and 1997, but no ECI adjustment or COLA for the federal judges in those years. It is the latter years and future compensation that are the subject of this case. As argued by the defendant, the failure of the federal judges to receive ECI adjustments for those years resulted from the fact that Congress, acting pursuant to Section 140, did not vote an ECI adjustment for federal judges in those years.

## II

■ Before addressing the merits of this litigation, the Court will address whether it is necessary for this Court to recuse itself from consideration of this case. This matter is addressed in view of the defendant's "Suggestion of Designation and Temporary Assignment of District Judge Who Took office on or After January 1, 1998, to Hear and Decide This Case." The Court hastens to note that the defendant has not requested the Court to recuse itself; rather, it suggested that the assignment to a federal judge appointed after the complaint was filed and one who was not a sitting Article III judge during 1995, 1996 or 1997 might raise less of an issue of an appearance of conflict. The plaintiffs opposed the Suggestion and the Court concluded that there is no impediment to the Court retaining this case.

There is no Article III federal judge who does not have an interest in the case. This includes judges appointed before and after December 31, 1997. Thus, any decision in this case will affect the compensation of every Article III judge.

A similar issue was addressed in *United States v. Will*, 449 U.S. 200, 101 S.Ct. 471, 66 L.Ed.2d 392 (1980), a case which both sides to the controversy contend dictates the decision the Court must reach on the merits in this case. Like this case, *Will* involved a question as to whether Article III judges should have received a cost-of-living increase during four years in question. The Supreme Court concluded that the federal judges were entitled to the cost-of-living adjustment for two of the four years. More important on the limited issue relating to disqualification or recusal, the Supreme Court concluded that neither the District Court judge in *Will* nor any Justice of the Supreme Court was required to be disqualified though both the District Judge and the Justices of the Supreme Court could be said to have an interest in the outcome of the case. In so holding, the Supreme Court recognized the continuing validity of the Rule of Necessity.

It noted that the rule "had its genesis at least five and a half centuries ago." 449 U.S. at 213, 101 S.Ct. at 480. Second, the Supreme Court concluded that 28 U.S.C. § 455 (relating to disqualification of a judicial officer) "was to deal with the reality of a positive disqualification by reason of an interest or the appearance or possible bias." 449 U.S. at 216, 101 S.Ct. at 481. It was "not intended by Congress to alter the time-honored Rule of Necessity." 449 U.S. at 217, 101 S.Ct. at 482. The Supreme Court went on to state that "we would not casually infer that the Legislative and Executive Branches sought by the enactment of § 455 to foreclose federal courts from exercising 'the province and duty of the judicial department to say what the law is.'" 449 U.S. at 217, 101 S.Ct. at 482 (citing to *Marbury v. Madison*, 1 Cranch 137, 177, 2 L.Ed. 60 (1803)).

This Court is not required to recuse itself is this case. Nor is this Court disqualified from hearing this case. The case cannot be transferred to any Article III judge who does not have an interest in the outcome of the case simply because it affects every Article III judge. The Court concludes that, pursuant to the Rule of Necessity, this Court can hear and decide this case.

### III

Any discussion relating to the compensation of Article III federal judges must begin with consideration of the comments and words of the Founding Fathers of this great nation. As the Supreme Court noted in *Will*, "[t]he Compensation Clause has its roots in the long standing Anglo–American tradition of an independent Judiciary." 449 U.S. at 217, 101 S.Ct. at 482. "A Judiciary free from control by the Executive and the Legislative is essential if there is a right to have claims decided by judges who are free from potential domination by other branches of government." 449 U.S. at 217–218, 101 S.Ct. at 482. This view can been traced to our Founding Fathers who were very aware of the importance of an independent judiciary. In Federalist No. 79, Hamilton stated that "[n]ext to permanency in office, nothing can contribute more to the independence of the judges than a fixed provision for their support." He noted that "[i]n the general course of human nature, a power over a man's subsistence amounts to a power over his will. And we can never hope to see realized in practice, the complete separation of the judicial from the legislative power, in any system which leaves the former dependent for pecuniary resources on the occasional grants of the latter." Hamilton observed that "the salaries for judicial officers may from time to time be altered, as occasion shall require, yet so as never to lessen the allowance with which any particular judge comes into office in respect to him." He even noted the distinction between a salary paid to the President, as opposed to that paid to a judge. He observed that since the President is elected "for a term of no more than four years, it can rarely happen that an adequate salary, fixed at the commencement of that period, will not continue to be such to its end." But for judges appointed to serve for life, "it will happen, especially in the early stages of government, that a stipend, which would be very sufficient at their first appointment, would become too small in the progress of their service."

In *Will*, the Supreme Court traced the laws protecting the compensation of judges in English history and in the history of this nation. 449 U.S. at 217–221, 101 S.Ct. at 482–483. As the Supreme Court observed, Madison's notes on the Constitutional Convention reveal that at one point there was a tentative arrangement under which Congress could neither increase nor decrease the compensation of judges. But Gouvernour Morris was successful in striking the prohibition on increases. 449 U.S. at 219, 101 S.Ct. at 483. It appears that Madison's support for Congress not having the power to decrease or increase the compensation of sitting judges grew out of a concern that in either case, judges would

be inclined to defer to Congress. Morris' argument prevailed before the Constitutional Convention.

The Supreme Court quoted a significant portion of The Federalist No. 79, as follows:

It will readily be understood, that the fluctuations in the value of money, and in the state of society, rendered a fixed rate of compensation [of judges] in the Constitution inadmissible. *What might be extravagant to-day might in half a century become penurious and inadequate. It was therefore necessary to leave it to the discretion of the legislature to vary its provisions in conformity to the variations in circumstances; yet under such restrictions as to put it out of power of that body to change the condition of the individual for the worse.*

449 U.S. at 220, 101 S.Ct. at 483 (emphasis this Court's).

The Supreme Court recognized yet another purpose of the Compensation Clause. It stated:

This Court has recognized that the Compensation Clause also serves another, related purpose. *As well as promoting judicial independence, it ensures a prospective judge that, in abandoning private practice-more often than not more lucrative than the bench-the compensation of the new post will not diminish.* Beyond doubt, such assurance has served to attract able lawyers to the bench and thereby enhances the quality of justice.

449 U.S. at 220–221, 101 S.Ct. at 483 (citations omitted, emphasis this Court's). The Supreme Court echoed a similar sentiment 79 years ago in yet another case which related to the passage of the 16th Amendment which provided for a federal income tax. *Evans v. Gore,* 253 U.S. 245, 40 S.Ct. 550, 64 L.Ed. 887 (1920). The plaintiff, Judge Evans, was a United States District Judge and was serving in that capacity when the new income tax law was enacted. He contended that in imposing the new income tax on him, Congress had diminished his pay in violation of the Compensation Clause. The Supreme Court agreed and held that the tax as imposed on a sitting Article III judge was invalid. The Supreme Court stated:

[T]he primary purpose of the prohibition against diminution was not to benefit the judges, but, like the clause in respect of tenure, to attract good and competent men [and women] to the bench and to promote that independence of action and judgment which is essential to the maintenance of the guaranties, limitations, and pervading principles of the Constitution and to the administration of justice without respect to persons and with equal concern for the poor and the rich. Such being its purpose, it is to be construed, not as a private grant, but as a limitation imposed in the public interest; in other words, not restrictively, but in accord with its spirit and the principle on which it proceeds.

*Obviously, diminution may be effected in more ways than one. Some may be direct and others indirect, or even evasive as Mr. Hamilton suggested. But all which by their necessary operation and effect withhold or take from the judge a part of that which has been promised by law for his services must be regarded as within the prohibition. Nothing short of this will give full effect to its spirit and principle.*

253 U.S. at 253–54, 40 S.Ct. at 553 (emphasis this Court's).

There is no doubt but that those words based on experience and sound judgment over the centuries and the words written and uttered by the Founding Fathers are just as relevant and important today as they were at the dawn of this nation. It was the Founding Fathers' understanding of the need for an independent judiciary which led them to include within the Constitution, Article III, § 1, which provides:

The Judges, both of the supreme and inferior Courts, shall hold their Offices

during good Behaviour, and shall, at stated Times, receive for their Services, a Compensation, *which shall not be diminished during their Continuance in Office.* (Emphasis this Court's).

The Founding Fathers were obviously very concerned about creating and maintaining an independent judiciary. This apparently led Madison to feel that allowing Congress to make any adjustment in judges' pay, up or down, could have a serious impact on that independence. His view did not prevail because the result would have been the opposite of what he intended. There is a suggestion that Madison thought of tying judicial salaries to the price of a commodity so that when that price rose, the judges' income would rise as well. 449 U.S. at 220, n. 22, 101 S.Ct. at 483, n. 22. He commented that: "The variations in the value of money, may be guarded agst. by taking for a standard wheat or some other thing of permanent value." 449 U.S. at 220, 101 S.Ct. at 483 (citation omitted). The Supreme Court noted that "Morris criticized the proposal for overlooking changes in the state of the economy; the value of wheat may change, he said, and leave the judges undercompensated." *Id.* We are told that the Founders may have rejected that plan due to an unsatisfactory experience with a similar plan in Virginia relating to payment for members of the clergy. 449 U.S. at 220, n. 22, 101 S.Ct. at 483, n. 22. But, in any event, the Founding Fathers, like our modem day Congress, grappled to find a method for providing fair compensation to judges and a method for addressing any increases in the cost of living. Indeed, Madison's suggestion that wheat be used as a measure was, no doubt, an early attempt to provide automatic cost-of-living adjustments.

One modern attempt to address that concern was the Adjustment Act. Under that Act, the judges were to receive the same annual percentage adjustment as the annual adjustment made in the General Schedule under the Comparability Act.

The Comparability Act delegated to the President the power to set the salary adjustment for General Schedule employees, either by submitting an order and report based on recommendations of an agent or by submitting an Alternative Plan. The Alternative Plan was to be filed prior to September 1 of each year. In fact, the President submitted an Alternative Plan every year. That plan then became law unless vetoed by either House of Congress within thirty days. Until the Congress and the President acted on the legislation to repeal or allow an adjustment, there was no final law in place to adjust salaries. This was the state of the law in 1980 addressed by the Supreme Court in *Will.* In Year One, relating to adjustments for Fiscal Year 1977, the Supreme Court held that since the Congressional statute which would have repealed the adjustment was not signed until October 1, it effectively would have diminished the compensation of federal judges since the COLA under the Adjustment Act was effective midnight of September 30. 449 U.S. at 224–226, 101 S.Ct. at 485–486. For Fiscal Years 1978 (Year 2) and 1979 (Year 3), the President signed the repealing statutes prior to October 1 of each year, and thus the adjustments did not vest. 449 U.S. at 226–229, 101 S.Ct. at 486–487. Finally, with respect to Year 4, Fiscal Year 1980, the President did not sign the repealing legislation until after October 1, thus the adjustment vested.

It is clear that the pay legislation addressed by the Supreme Court in *Will* did not vest until such time as the President acted by signing or not signing the repealing statute on or before September 30 of a given year. Although Congress had set up a mechanism to address the issue of yearly salary adjustments under that legislation, the President had until September 30 to accept or reject the proposed adjustment. Therefore, up until September 30 of a given year, it was not clear whether there would be an adjustment or the amount of any adjustment.

The Ethics Reform Act differs substantially from the provisions discussed above. *See Boehner v. Anderson,* 308 U.S.App. D.C. 94, 96, 30 F.3d 156, 158 (1994). First, the Act imposes severe limitations on the outside income federal judges may earn, forbid the receipt of honorariums and imposes mandatory work loads on senior judges. Second, the new Act revised the process for providing annual cost-of-living adjustments for federal judges. The trigger occurs when there is an adjustment in the General Schedule salaries, then the judges are to receive an adjustment as well. Perhaps the most significant change was that Congress took control and prescribed the means for determining the annual pay adjustment. The Ethics Reform Act provides that starting in 1991, federal judges' salaries are to be adjusted annually based on the Employment Cost Index, or ECI. The ECI is a quarterly index of wages and salaries for private industry workers published by the Bureau of Labor Statistics. Finally, the Ethics Reform Act set a cap on the amount of any cost-of-living adjustment for judges; no increase can exceed five percent.

The Bipartisan Task Force on Ethics which was appointed by Congress found that failure to implement cost-of-living adjustments was "the single most important explanation for the growing disparity between top salaries in government and the private sector, and the 38% loss of purchasing power by these officials [Executive Schedule positions] since 1969." 135 Cong. Rec. H9265 (daily ed. Nov. 21, 1989). The Task Force recommended that the ECI, minus one-half a percent (0.5%), be used. *Id.* Pursuant to the Ethics Reform Act, adjustments were made to judges' compensation in 1991, 1992 and 1993, since in each of those years there were adjustments to the General Schedule salaries. In 1994 there was no adjustment to the General Schedule salaries, and therefore, the ECI adjustment for federal judges was not triggered under the 1989 Act. The Ethics Reform Act appeared to work well since such adjustments were automatic,

and required no action by the President or the Congress. Moreover, the adjustments were non-political and fair in the sense that they were based on the ECI. However, for Fiscal Years 1995, 1996 and 1997, although the General Schedule employees received adjustments based on the ECI, the judges' pay was not adjusted because Congress adopted and the President signed resolutions which purported to withhold the scheduled adjustments which were provided for federal judges under the Ethics Reform Act. There is no factual dispute as to the trigger, that is whether an adjustment in the General Schedule took effect for each of those years; it did.

As the Court noted, there is a substantial difference between the mechanism under the prior Act and the Ethics Reform Act. By its terms, as held by the Supreme Court in *Will,* the adjustments under the prior Act did not take effect until such time as the President acted or failed to act on any repealing legislation on or before September 30. Thus, clearly any increase in compensation by virtue of the adjustment did not vest until October 1.

The Bipartisan Task Force appointed by Congress quoted from the findings of the President's Commission on Executive, Legislative and Judicial Salaries in its report, "Fairness for our Public Servants."

> The Commission goes on to observe that while private sector wages have more than kept pace with inflation over the last two decades, the levels of salaries of senior officials in all three branches is about 65–70% in constant dollars of what their 1969 salaries were for the same positions. As a result, Federal Judges are resigning at a higher rate than ever before.

135 Cong. Rec. H9264 (daily ed. Nov. 21, 1989). This was a concern referred to in *Will.* 449 U.S. at 221, 101 S.Ct. at 483. The Task Force found that the system then in place for adjusting the salaries of Executive Level positions and federal

judges did not work. The Task Force noted:

> The current system of tying senior salaries to the same percentage increase as those of other Federal workers has only reopened to political gamesmanship what was intended to be a more objective and automatic cost-of-living adjustment (COLA).

*Id.* It cannot be overlooked that the concerns expressed by the Task Force are the same as those expressed by the Founding Fathers over two hundred years ago. The findings of the Task Force contributed to the enactment of the Ethics Reform Act of 1989.

The plaintiffs contend that the "1989 Congress specified the future salary of judges by adopting the ECI index." The defendant argues that the Ethics Reform Act did no more than to create a formula not unlike the formula provided in the Act considered by the Supreme Court in *Will.* Moreover, the defendant argues that when Congress set out a mechanism for payment in future years, that alone is evidence that Congress has created nothing more than a formula.

In *United States v. More,* 7 U.S. 159, 3 Cranch 159, 2 L.Ed. 397 (C.C.D.C.1805), Congress had enacted a system of fees for compensating justices of the peace, however, Congress thereafter abolished the fees. Justice of the Peace More continued to collect the fees and the government brought an indictment against him. The Circuit Court for the District of Columbia with presiding Justice, Chief Justice John Marshall, held that the salary in question was subject to the Compensation Clause. The Supreme Court in *Will* referred to *More* and noted that its decision with respect to Year 2 in *Will,* relating to Fiscal Year 1978, in which it held that the 1975 Adjustment Act increase had not vested before it was repealed, was not contrary to the decision in *More.* The Supreme Court stated that "[i]n *More,* the fee system was already in place as part of the justices' compensation when Congress repealed it.

Here [in *Will* ], by contrast, the increase in Year 2 *had not yet become part of the compensation of Article III judges when the statute repealing it was passed and signed by the President.*" 449 U.S. at 228, n. 32, 101 S.Ct. at 487, n. 32 (emphasis this Court's). The fee schedule in *More* was a system of fees for compensating justices of the peace. Although Congress provided for a fee schedule, it apparently could not set the specific amount of fees the justices of the peace would be paid. The distinction between *More* and *Will* is that the Year 2 increase in *Will* had not vested while the compensation plan based on fees to be earned in *More* had vested.

■ The Court concludes that the compensation plan under the Ethics Reform Act is similar to the fee schedule plan in *More,* except that the Ethics Reform Act is much more precise and definite. The 1989 Congress provides for the payment of cost-of-living increases to judges when General Schedule employees received such adjustments. The increases, if any, vested on the date of the enactment of the statute conditioned only on adjustments being granted to General Schedule employees. That plan is clearly distinguishable from that found in the earlier Act where the *Will* court found that vesting did not take place until October 1.

The defendant argues that in *Will* the Supreme Court held that a salary increase vests only when it takes effect. The defendant cites to the following language in *Will:*

> To say that the Congress could not alter a method of calculating salaries before it was executed would mean the Judicial Branch could command Congress to carry out an announced future intent as to a decision the Constitution vests exclusively in the Congress. *We therefore conclude that a salary increase vests for the purpose of the Compensation Clause only when it takes effect as part of the compensation due and payable to Article III judges.* With regard to Year 2,

we hold that the Compensation Clause did not prohibit Congress from repealing the planned *but not yet effective cost-of-living adjustment of October 1, 1977, when it did so before October 1, the time it was first scheduled to become part of judges compensation.* The statute in Year 2 thus represents a constitutionally valid exercise of legislative authority.

449 U.S. at 228–229, 101 S.Ct. at 487 (footnote omitted, emphasis this Court's). The key is that the adjustment vests "when it takes effect as part of the compensation due and payable to Article III judges"; not when the judge actually begins to receive the benefits of that adjustment. That was also the key in *More.*

The Supreme Court held in *Will* that Congress was not prohibited "from repealing *the planned but not yet effective* cost-of-living adjustment." *Id.* As this Court noted earlier, it is clear that in *Will,* an adjustment only became effective after September 30, and up until that time, a proposed adjustment could be repealed. Here, the situation is similar to *More.* Congress has not merely established a formula; rather, it has provided that in the future, beginning with 1991, cost-of-living adjustments will be paid to federal judges, provided such adjustments are made to General Schedule employees. Unlike the earlier law, the Ethics Reform Act did not provide for later action by the Congress and the President before the adjustment becomes effective. Here, the adjustment provided under the Ethics Reform Act is part of the judges' compensation.

A decision holding that the adjustment vested upon the enactment of the Ethics Reform Act finds support in *Boehner v. Anderson, supra.* That case involved the 1989 Act. Congressman Boehner filed an action alleging that the COLA provision of the 1989 Act violated the 27th Amendment to the Constitution which provides that no law "varying the compensation [of Members of Congress] shall take effect until an election of Representatives shall have in-

tervened." Mr. Boehner argued that each COLA took effect in the year it was payable, thus he contended that each COLA varied the compensation during the *current* term. In short, he argued that the Ethics Reform Act did not vary the Members' pay, rather, the pay was varied at the time of an annual adjustments and therefore each annual adjustment is a law varying the compensation of Members of Congress and occurs during the Members' current term. This would violate the 27th Amendment. The defendants in that case argued that each new adjustment was not a new law varying pay because the COLA provisions of the 1989 Act were in place in 1989. The Court of Appeals agreed with the defendants and held that the entitlement to a COLA became law upon the passage of the Ethics Reform Act. The court stated:

For example, the COLA provision became law in 1989 but the first COLA would not be made until more than a year later, on January 1, 1991— pursuant to the Congress's decision, prior to but in the spirit of the Madison amendment [27th Amendment], to defer implementation of the COLA until after the 1990 congressional election. See Ethics Reform Act, § 704(b) (codified at 5 U.S.C. § 5318 note) (COLA provisions "shall take effect on January 1, 1991"). We see no reason whatsoever why the Congress cannot, for convenience, instead specify an index or formula with the same effect.

In sum, *it has been the law since 1989 that a COLA would be made on January 1, 1991 and each year thereafter pursuant to a specified formula.*

308 U.S.App.D.C. at 100, 30 F.3d at 162 (emphasis this Court's).

This Court concludes that history, precedent and the law can lead to only one result. The Ethics Reform Act granted federal judges a COLA or ECI adjustment, effective at the time of the enactment of the Act in 1989. Pursuant to the Ethics Reform Act, federal judges are en-

titled to receive what the 1989 Act gave them; ECI adjustments for the years 1995, 1996 and 1997. Those adjustments vested when the 1989 Act was enacted, subject only to the condition that an ECI adjustment be made for General Schedule employees. In each of those years, General Schedule employees received an ECI adjustment. The Supreme Court held that "a salary increase 'vests' for the purpose of the Compensation Clause only when it takes effect as part of the compensation due and payable to Article III judges." 449 U.S. at 228–229, 101 S.Ct. at 487. Here the ECI adjustments became part of the judges' compensation due and payable to the judges when the Ethics Reform Act became law. "The Ethic Reform Act became law on November 30, 1989 when, the bill having passed both Houses and been presented to President Bush, he signed it into law. The provision calling for an annual COLA is part of that 1989 law." *Boehner,* 308 U.S.App.D.C. at 99, 30 F.3d at 156 (citations omitted).

The Court concludes then that the Ethics Reform Act requires that the federal judges receive the ECI adjustments in any year when the General Schedule employees receive such adjustments. That includes 1995, 1996 and 1997, as well as any future years.

### IV

The Ethics Reform Act would appear to dispose of this matter, however, the defendant argues that pursuant to Section 140, no COLA for federal judges can take effect without being specifically authorized by Congress. In other words, defendant contends that an adjustment for federal judges is not automatic; rather, it requires affirmative action by Congress. Interestingly enough, Section 140, Pub.L. 97–92, was adopted even prior to the enactment of the 1989 Act. Section 140 provides:

> Notwithstanding any other provision of law or of this joint resolution, none of the funds appropriated by this joint resolution or by any other Act shall be obligated or expended to increase, after the date of enactment of this joint resolution, any salary of any Federal judge or Justice of the Supreme Court, except as may be specifically authorized by Act of Congress hereafter enacted: *Provided,* That nothing in this limitation shall be construed to reduce any salary which may be in effect at the time of enactment of this joint resolution nor shall this limitation be construed in any manner to reduce the salary of any Federal judge or any Justice of the Supreme Court. Pub.L. 97–92, § 140, 95 Stat. 1182, 1200 (1982)(emphasis in the original).

Section 140 was originally scheduled to expire on March 31, 1982, *see* Pub.L. 97–92, § 102, but was extended to September 30, 1982, pursuant to Pub.L. 97–161, 96 Stat. 22 (March 31, 1982). There is no legislative history relating to Section 140 except for statements by Senator Robert Dole in offering the amendment.

The Comptroller General has consistently interpreted Section 140 as barring the payment of automatic adjustments to judges in subsequent years, including ECI adjustments payable under the Ethics Reform Act. The defendant relies, in part, upon that interpretation. In response to the argument of the defendant, the plaintiffs contend that (1) Section 140 was not permanent legislation or, (2) even if it was permanent legislation, Section 140 has been superseded by the Ethics Reform Act, or (3) the adjustments provided for under the 1989 Act have been approved by Congress and thus comply with Section 140 or, (4) to the extent that Section 140 would otherwise bar ECI or COLA adjustments, under the 1989 Act, Section 140 is unconstitutional.

Shortly after Section 140 was passed, the Comptroller General responded to a letter from the Honorable Jamie L. Whitten, Chairman of the Committee on Appropriations. Letter dated October 1, 1982, Plaintiffs' Motion Exhibit I. The Comptroller General stated:

That provision [Section 140] was introduced for the stated purpose of precluding the annual cost-of-living increase which a Federal judge of Justice of the Supreme Court would otherwise receive on October 1 of any year in which a cost-of-living salary adjustment is made to the General Schedule under 5 U.S.C. § 5305. Congressional Record, Senate S13373, November 13, 1981. *Absent section 140, the adjustment for Federal judges and Justices of the Supreme Court is mandated by law* (emphasis this Court's).

In discussing whether Section 140 constitutes permanent legislation, the Comptroller General noted:

We have held that a provision contained in an annual appropriation act may not be construed to be permanent legislation unless the language used therein or the nature of the provision renders it clear that such was the intent of Congress. We believe that the language of section 140 when construed together with the nature of the provision results in a clear showing of a congressional intent to enact permanent legislation.

Standing alone, the language of section 140 "by any other act * * * after the date of the enactment of this resolution" is not persuasive as to permanency. However, the additional phrase "except as may be specifically authorized by Act of Congress hereafter enacted" does lead us in that direction. Moreover, to view section 140 as not being permanent legislation would strip the section of any legal effect.

The Comptroller General went on to note that Section 140 was included in a continuing resolution which was enacted on December 15, 1981 and which expired on September 30, 1982, while the next cost-of-living adjustment was to be effective October 1, 1982. He then stated that "if section 140 were not to be held permanent legislation, the section would have no legal effect since it would have been enacted to prevent increases during a period when no increases were authorized to be made."

On November 23, 1982, the Comptroller General had a second opportunity to address Section 140 when the Director of the Administrative Office of the United States Courts asked him to reconsider the conclusion he reached in his October 1 letter. The Comptroller General responded:

As we stated in our opinion letter of October 1, 1982, we have held that a provision contained in an annual appropriations act may not be construed to be permanent legislation unless the language or the nature of the provision makes it clear that such was the intent of Congress. Usually, when the word "hereafter" or other words indicating futurity are used, or when the provision is of a general character bearing no relation to the object of the appropriation, the provision may be construed as permanent legislation. Section 140 of public Law 97–92, quoted above, contains such words of futurity, and the provision bears no direct relation to the object of the appropriation act in which it appeared, a continuing appropriations act for fiscal year 1982. Thus we conclude that section 140 is permanent legislation.

62 Comp. Gen. 54, Plaintiffs' Motion Exhibit J. The Comptroller General reached similar conclusions in 1983. 62 Comp. Gen. 358,63 Comp. Gen. 141, Plaintiffs' Motion Exhibits K and L. In 1986, the Comptroller General responded to a letter from Judge Frank M. Coffin in which Judge Coffin noted that in a discussion during a hearing in 1982, "Senator Dole [a sponsor of Section 140] stated that the amendment (section 140) would be in effect for only 1 year." Plaintiffs' Motion Exhibit M. Judge Coffin contended that this statement by Senator Dole helped identify the legislative intent behind Section 140. Indeed, the Comptroller General noted that he had received a letter from Senator Dole on March 18, 1985 in which Senator Dole stated that "the intent was to limit the application of this amendment [Section

140] to the fiscal year in which it was enacted, and he points out that the Senate rule and practice is not to attach permanent legislation to continuing resolution." However, the Comptroller General noted that at the time Senator Dole introduced section 140 he stated that the purpose was "to put an end to the automatic backdoor pay raises for federal judges." Noting this "conflict" in Senator Dole's remarks, the Comptroller General affirmed his prior decisions. 65 Comp. Gen. 352, Plaintiffs' Motion Exhibit M. Finally, the Comptroller General noted that "it is doubtful Congress intended to deny federal judges the same comparability increases provided to other federal employees." *Id.*

The Court does not find the decision of the Comptroller General to be persuasive. The Court concludes that Section 140 was not permanent legislation. The Comptroller General's reasoning that Section 140 would have no legal effect if it was not permanent legislation, does not necessarily follow since Section 140 could have been amended or changed by Congress between December 15, 1981 and September 30, 1982. Thus, a holding that Section 140 was not permanent legislation would not have "strip[ped] the section of any legal effect."

The Court also notes that Section 140 does not mention either the Adjustment Act or the Salary Act. The Supreme Court held that:

> As a general rule, "repeals by implication are not favored." This rule applies with especial force when the provision advanced as the repealing measure was enacted in an appropriations bill. Indeed, the rules of both Houses limit the ability to change substantive law through appropriations measures.

*United States v. Will,* 449 U.S. at 221–222, 101 S.Ct. at 484 (citations omitted). *See also Tennessee Valley Authority v. Hill,* 437 U.S. 153, 189, 98 S.Ct. 2279, 2299, 57 L.Ed.2d 117 (1978). The Court concludes that Section 140 did not repeal the earlier Acts.

The Court further concludes that Section 140 was not permanent legislation and that it expired no later than September 30, 1982 and thus does not affect legislation which was passed after that date. Moreover, the Court notes that even the Comptroller General found it doubtful that Congress intended to deny federal judges the pay adjustments given to other federal employees. These factors, together with the presumption against repeals by implication, the rules against using an appropriation measure to amend substantive legislation and the rule that an appropriation measure expires when the appropriation it authorized expires, all weigh against the interpretation given Section 140 by the Comptroller General and against the argument relating to Section 140 made by the defendant. All of this convinces this Court that Congress did not deliberately ignore the Compensation Clause or deliberately decide to deprive the federal judges of pay adjustments afforded all other federal employees. For this reason and for the reasons stated in Part III, *supra,* the plaintiffs are entitled to prevail in this lawsuit.

## V

Although the Court has determined that Section 140 did not repeal the earlier Acts and has no force or effect on subsequent legislation and that ruling should dispose of this case, there is another reason why the plaintiffs prevail in this case. Even if one accepts the defendant's argument that Section 140 was permanent legislation, which this Court does not, when Congress enacted the Ethics Reform Act, that Act superseded Section 140. The defendant, adopting the position of the Comptroller General, argues that because of Section 140, Congress was required to take affirmative action in order to give the federal judges the benefit of ECI adjustments. Assuming that the defendant is correct, Congress took such affirmative action when it enacted the Ethics Reform Act in 1989. As noted above, Part III,

*supra*, the Ethics Reform Act made substantial changes respecting the compensation of federal judges. Congress did not merely change the formula for determining compensation, it provided that federal judges were not entitled to receive honorariums and it limited other outside income. This Court has no knowledge as to the number of judges who may have received honorariums or outside income, but to the extent any did, their potential outside income has now been ·reduced by the Ethics Reform Act. It seems reasonable to assume that Congress must have factored this into the equation when it addressed the future compensation of judges. With respect to senior federal judges, the Congress required that they perform a minimum level of service in order to be certified by the Chief Justice, in the case of Justices of the Supreme Court, and by the Chief Judge of the Circuit, in the case of Circuit and District Judges. Congress did more. It enacted a pay raise for Executive and Legislative senior officials and federal judges bringing those officials closer in pay to their civilian counterparts. Ethics Reform Act, § 703. Last in this regard, Congress established a formula for determining the rate of any pay adjustment by tying any increase to the Employment Cost Index or ECI. Ethics Reform Act, § 704. Thus, when Congress enacted the Ethics Reform Act, it did not merely change a formula, it made a number of changes and it set in place a mechanism which provides for future cost-of-living adjustments without any affirmative action by Congress or the President.

Congress did reference Section 140 in the 1989 Act. It provided under a clause entitled "Specific Authority" that "[f]or the purposes of [Section 140], appropriate salary increases are hereby authorized for Federal judges and Justices of the Supreme Court pursuant to subsection (a)." Ethics Reform Act, § 702(c).

There were substantial changes relating to the payment of federal judges under the Ethics Reform Act. *The Act provided for ECI adjustments as part of the compensation of federal judges.* Moreover, while under the old Act a pay adjustment did not vest until October 1 of a given year, the Ethics Reform Act became effective on the date of its enactment and provided for annual adjustments to judges' salary, conditioned only on an ECI adjustment being made for employees on the General Schedule. The Employment Cost Index determines the rate of any adjustment, and if such an adjustment is approved for those on the General Schedule, there is an *automatic* adjustment for members of the federal judiciary. Neither the Congress nor the President is required to take any other action, unlike in the case of the earlier Acts where the Congress and the President could take action to deprive the judges of a cost-of-living adjustment on or before September 30.

Assuming, as this Court does not, that Section 140 was permanent legislation, Congress enacted the Ethics Reform Act under "specific authority" for the purposes of Section 140. The defendant argues that the reference to Section 140 suggests that Congress considered and still considers Section 140 to be viable. This Court disagrees. Rather, in view of past opinions by the Comptroller General holding that Section 140 required affirmative action by Congress in increasing or adjusting judges' pay, the reference to Section 140 appears to have been inserted, not as a means of continuing the viability of Section 140, but to make certain that the federal judges are to receive the full benefits accorded them under the Ethics Reform Act. Those benefits being a pay raise in 1991 and an ECI adjustment in any year in which an ECI adjustment is given to General Schedule employees.

## VI

In sum, the Court concludes that Section 140 was not permanent legislation and that, in any event, it has no effect on the cost-of-living adjustments made under the Ethics Reform Act. The Ethics Reform

Act was effective on January 1, 1991, and the entitlement to annual cost-of-living adjustments under that Act vested on January 1, 1991, subject only to one condition, that such an adjustment be given to General Schedule employees for the same year. Accordingly, the plaintiffs are entitled to summary judgment, and the motion for summary judgment filed by the defendant will be denied with prejudice. The federal judges have not asked for and are not entitled to a cost-of-living adjustment for Fiscal Year 1994 since there was no adjustment for General Schedule employees for that year. The federal judges are entitled to cost-of-living adjustments for 1995, 1996 and 1997, together with all other benefits which should have accrued to them based upon those adjustments.

Finally, the Court concludes that in view of the fact that the ECI adjustments vested as of the effective date of the Ethics Reform Act, those adjustments cannot be withheld pursuant to Section 140 in any event, since such action would serve to unconstitutionally diminish the compensation of Article III judges in violation of the Compensation Clause of the Constitution of the United States.

An appropriate order shall be entered.